Jon E. YOUNT, Petitioner,

v.

Earnest S. PATTON, Superintendent,
SCI—Camp Hill, and Harvey Bartle III,
Attorney General of the Commonwealth
of Pennsylvania, Respondents.

Civ. A. No. 81–234.

United States District Court,
W. D. Pennsylvania.

April 22, 1982.

George E. Schumacher, Federal Public Defender, Pittsburgh, Pa., for petitioner.

F. Cortez Bell, Dist. Atty. of Clearfield County, Clearfield, Pa., for respondent.

## OPINION

ZIEGLER, District Judge.

Presently before the court is the petition of Jon E. Yount for a writ of habeas corpus alleging that his state court conviction of first degree murder is constitutionally infirm. We hold that Yount has failed to establish a violation of the Due Process Clause of the Fourteenth Amendment and therefore relief will be denied.

### I. *History of Case*

Petitioner was indicted for the crimes of murder and rape at No. 2 May Sessions 1966 in the Court of Common Pleas of Clearfield County, Pennsylvania. On October 7, 1966, he was convicted by a jury of first degree murder and rape and an appeal was taken from the judgment of sentence. The Supreme Court of Pennsylvania reversed and granted a new trial. *Commonwealth v. Yount*, 435 Pa. 276, 256 A.2d 464 (1969), *cert. denied*, 397 U.S. 925, 90 S.Ct. 918, 25 L.Ed.2d 104 (1970). The prosecutor dismissed the rape charge prior to re-trial and, following selection of a jury, Yount was again convicted of first degree murder. A life sentence was imposed. An appeal was taken.

The Supreme Court of Pennsylvania unanimously affirmed the judgment in *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974), and petitioner filed the instant pro se action, pursuant to 28 U.S.C. § 2254, advancing three issues. Counsel was appointed and filed an amendment to the petition with additional contentions. On March 2, 1982, the Supreme Court of the United States announced its decision in *Rose v. Lundy*, —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Counsel for petitioner then filed a motion to amend the original and amended petitions to comply with the teachings of *Rose*. There the Supreme Court explained "that a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." —— U.S. at ——, 102 S.Ct. at 1199.

On March 31, 1982, this court granted Yount's motion to delete from the original petition paragraphs 12–C(a), 12–C(b), 12–C(c), 12–C(d), 12–C(e), 12–C(f) and 12–D, as well as subparagraphs 1, 2, 3 and 4(a) through (f) of the amended petition. Thus we are required to decide the three issues

raised by Yount at paragraphs 12–A, 12–B and 12–C of the original petition, since it is clear that he has exhausted the remedies available to him in the courts of Pennsylvania. *See, Brown v. Cuyler*, 669 F.2d 155 (3d Cir. 1982).

■ This court is limited to those issues because as *Rose* and *Brown* make clear we may consider only claims that have been exhausted in state court. In *Yount II* Justice Roberts, speaking for the Court, specifically addressed the issues raised in paragraphs 12–A, 12–B and 12–C of the original petition. We need not decide, of course, whether Yount may be precluded by Habeas Corpus Rule 9(b), 28 U.S.C. § 2254, from pursuing subsequent federal petitions by seeking speedy federal review of the exhausted claims. *But see, Rose v. Lundy*, —— U.S. at —— – ——, 102 S.Ct. at 1203–1205. In sum, we hold that petitioner has exhausted his state court remedies as required by 28 U.S.C. § 2254 (1976) with respect to the three challenges set forth in the original petition for habeas relief.

## II. *Discussion*

Yount's original petition was referred to a magistrate of this court for consideration of the following allegations:

12–A. Petitioner's conviction was obtained by a violation of his privilege against self-incrimination through the use of oral statements elicited without required *Miranda* warnings.

12–B. Petitioner's conviction was obtained in violation of his constitutional right to select and empanel a fair, impartial and "indifferent" petit jury.

12–C. Petitioner's conviction was obtained in violation of his constitutional right to a fair and impartial trial as a result of trial court prejudicial charge to the jury and included erroneous instructions.

The magistrate issued a report and recommendation in which he found no constitutional transgression with respect to contentions 12–A and 12–C. We agree with those findings and therefore we will adopt and incorporate as the opinion of the court the findings of the magistrate as to those allegations of the original petition. We reject, however, the recommendation of the magistrate that a writ be granted and Jon Yount discharged from custody unless, within 60 days, a new trial is granted, predicated on a violation of the Due Process Clause of the Fourteenth Amendment, because petitioner was allegedly denied a fair and impartial jury.

Our starting point must be the recent pronouncement of the Supreme Court concerning the ambit of our authority to reverse this state court judgment.

A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution. As we said in *Cupp v. Naughten*, 414 U.S. 141, 146 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] (1973): 'Before a federal court may overturn a conviction resulting from a state trial ... it must be established not merely that the [State's action] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.'
Absent such a constitutional violation, it was error for the lower courts in this case to order a new trial.... Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension. *Chandler v. Florida*, 449 U.S. [560] at 570, 582–583 [101 S.Ct. 802 at 807, 813–814, 66 L.Ed.2d 140]; *Cupp v. Naughten, supra*, [414 U.S.] at 146 [94 S.Ct. at 400]. No such wrongs occurred here.

*Smith v. Phillips*, —— U.S. ——, ——, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). In performing our jurisprudential function, we have been cautioned by the Supreme Court that the findings of a state court judge are presumptively correct under 28 U.S.C. § 2254(d), and the presumption can only be overcome by convincing evidence to the contrary. *Id.* at ——, 102 S.Ct. at 946; *Summer v. Matter*, 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).

■ Petitioner's constitutional challenge of the decision of the trial judge to deny timely motions for a change of venue involves three discrete arguments. First, excessive and biased pretrial publicity prevented a fair trial; second, substantial community bias required a change of venue; and third, the trial court erred in denying several challenges for cause. Petitioner bears the burden of proving all facts entitling him to discharge, *Brown v. Cuyler, supra,* at 158, and since he has raised the issue of pretrial publicity, federal law requires that Yount's conviction may be overturned only upon a showing that the publicity was so extreme as to cause actual prejudice to a degree rendering a fair trial impossible or that the press coverage has "utterly corrupted" the trial. *Murphy v. Florida,* 421 U.S. 794 at 798, 95 S.Ct. 2031 at 2035, 44 L.Ed.2d 589 (1974).

### A.

■ The record in the instant case contains two memoranda and one opinion by the trial judge relating to his decision to deny a change of venue. Pretrial publicity is discussed in each. The first was filed on September 21, 1970, prior to selection of the jury. The court found:

> [T]he evidence was limited to the fact that without editorial comment of any kinds the newspapers in the County reported the decision of the Supreme Court of Pennsylvania; but it is to be noted that they not only referred to the dissenting opinion and quoted it, but also to the majority opinion and quoted it. We do not believe that the mandates of the cases extend so far as to say that the news media cannot publicize, without editorial comment, the decisions of our Courts. . . .

Brief of respondents at 20–21. The second memorandum is dated November 14, 1970, after 156 jurors had been interrogated during an 8-day period. The judge found:

> The Court would also note that it has been 4 years since the first trial of this cause, and so far as this Court can recall, there has been little, if any, talk in public

concerning the trial from that time to the time when it was announced that a trial date had been fixed. . . .

> Nor do we find any unfair inferences or prejudicial effects as to or against the defendant resulting in any of the newspaper items which have been the subject of the affidavit filed in this regard on November 13, 1970. With all of the publicity to which they refer, this Court is cognizant that at no time since the commencement of this case on November 4, 1970, have there been any more than 4 spectators in the Court Room, and at most times, 2 of these were 'Court House hangers on.' This is some indication of the fact that particularily in a community as small as ours, there has not been any great effect created by any publicity. . . .

Brief of respondents at 24–25. The final factual finding is found in the post-trial opinion of January 15, 1973.

> The first of the trials occurred in 1966, and is pointed out herein, the second one occurred in 1970. As the record will indicate there was practically no publicity given to this matter through the news media in the meanwhile except to report that a new trial had been granted by the Supreme Court. It is to be noted also that throughout the second trial there was practically no public interest shown in the trial; one thing to be noted is that on some days there being practically no persons present even to listen to it. . . .

The foregoing represent findings by a state court judge that are presumptively correct under the teachings of *Summer, supra.* The pretrial publicity in Clearfield County prior to trial was found to be balanced and accurate, and we cannot conclude from our independent review of the record that there is convincing evidence to the contrary.

The journalistic reports that Yount was to be retried for the crimes for which he was indicted were not inflammatory so as to preclude a fair trial. To accept petitioner's argument would require a change of venue in all prominent criminal cases that are retried merely because they are report-

ed by the press. There is no constitutional precedent for such an assertion. The news reports concerning the exhaustion of various jury panels and the progress of voir dire are to the same effect. Finally, we find the record barren of evidence to support petitioner's contention that the journalists of Clearfield County intentionally failed to report the good faith decision of the prosecutor to dismiss the rape charge prior to trial. The decision to dismiss was based on a lack of admissible evidence at the second trial and we find that the press accurately reported the status of the case when the information became public knowledge. *See*, Exs. P 1–11, mm, ss, tt, uu, vv and yy.

Most importantly there is no evidence of record of official misconduct either in dismissing the rape charge prior to trial, or in influencing the publicity given the case as in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) or *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Nor does the pretrial publicity reveal the viciousness evidenced in *Rideau, Sheppard* or *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Finally, the publicity in quantity does not approach the mischief detected in *Sheppard.* We are presented, at best, with substantial knowledge in a County of 78,000 citizens that a new trial had been granted in a case involving a significant crime. We find that petitioner has failed in his burden of establishing publicity so extreme as to cause actual prejudice rendering a fair trial impossible in Clearfield County, or that the coverage utterly corrupted the judicial process. *Martin v. Warden*, 653 F.2d 799, 805 (3d Cir. 1981).

### B.

Yount next contends that the trial court's decision to deny a change of venue in the face of alleged substantial community bias prevented the selection of an impartial jury and thus denied him a fair trial in contravention of the Sixth and Fourteenth Amendments. Citing statistics that support a finding of general knowledge of the pending cause, Brief of petitioner at 7–8, 26–27, and that many of the prospective jurors expressed fixed opinions as to guilt, Brief of petitioner at 27, Yount would have us hold that the trial judge committed error of constitutional magnitude when he denied a change of venue. We disagree. The extensive latitude granted by the trial judge during voir dire, as well as the responses of the twelve jurors who were sworn to try this case satisfy the constitutional standard of due process under the Fourteenth Amendment.

Again we must look to the factual findings of the trial court. In its opinion denying post-trial motions, the court found:

> The mere fact that it took such a long time to select a jury was simply that defendant raised so many questions and the Court exercised its discretion to assure that there could be no complaint about the final jury empanelled. Certainly because it takes a lengthy time to select a jury is not a sufficient basis for declaring that there is any prejudice or bias whatever involved. In fact, as already indicated this Court perceived no bias or prejudice resulting in any manner.

Brief of respondents at 28. The court also made reference to this contention in its second memorandum dated November 14, 1970, after 121 jurors had been excused for cause. Twelve jurors had been seated. The court observed:

> It is to be considered also that fair trial is not precluded in this case; when one recognizes that almost all, if not all, jurors already seated had no prior or present fixed opinion, and this was established by a very searching examination and cross-examination by counsel for defendant.

This ambiguous statement by the trial court and our duty of independent review requires us to examine the voir dire proceedings to determine whether there is evidence of community passion so pervasive that the accused was denied a fair trial before a "panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). We find there is none.

Jurors Blair Hoover, Clair Clapsaddle, John Yorke, Mary Jane Waple, Martin Karetski, Julia C. Hummell, Mrs. Jessie M. Parks, Albert I. Undercoffer, and Robert P. Murphy were seated without challenge or objection from Yount. Thus a strong argument can be made that petitioner has failed to preserve any argument with respect to these jurors, since he was represented throughout the trial by able, experienced and prominent counsel. More importantly, however, these jurors expressed no fixed opinion concerning guilt. Jurors Irene Kurtz, John T. Harchak and James J. Hrin were challenged for cause but Kurtz and Harchak indicated that they harbored no fixed opinion, and Hrin stated that, although he had an opinion, he would keep an open mind and would base his decision on the evidence presented at trial.

█ Yount continues to urge that these jurors maintained a fixed opinion concerning his guilt following lengthy interrogation. But our reading of the record is to the contrary. It is true, of course, that several jurors expressed an opinion on the ultimate issue at the outset. But this does not disqualify a citizen from participation in the judicial process if the juror is able to set aside any preconceived notion and render a verdict based on the evidence presented in court. *Martin v. Warden*, 653 F.2d 799, 806 (3d Cir. 1981); *United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir. 1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

Due to petitioner's allegation that community bias prevented the selection of a fair and impartial jury, we will review the critical responses of each juror during voir dire.

JUROR NO. 1—Blair Hoover

Q. Do you have any kind of fixed opinion as to his guilt or innocence?

A. On this question I would have to hear both sides—the facts—before I feel that I could express a true opinion.

Q. The question was, Mr. Hoover, whether or not you have an opinion now, at this time?

A. No.

Q. No opinion at all?

A. No.

    *    *    *    *    *    *

Q. And back at the time you heard these things and read these things, did you have an opinion?

A. Let's see. I would say that you'd come to some opinion, as far as just opinion on what you heard or what you may have read, but to me, as the way I've seen things in papers, in many papers, not to discredit any one paper, this don't say this is fact. So as far as forming a true opinion, I couldn't just do it by what I read. You'd read one thing and then another and somebody else would say something else. There was a lot of different opinions and I heard opinions both ways on it, in many different ways. Does that answer your question?

Q. It makes me think of a couple more.

A. Let me say this. If this would help you any, as I say, I heard as far as hearing—it wasn't one sided. I heard both ways so until you would know the true facts you couldn't—no one could come to a true opinion.

Transcript at 64–65.

    *    *    *    *    *    *

Q. Notwithstanding what you have read and heard concerning Mr. Yount, you are able to presume Mr. Yount innocent of any offense at this time?

A. Well, I feel any man or woman is innocent until proven guilty.

Q. My question is, do you feel that way concerning Mr. Yount at this time?

A. That would cover Mr. Yount too. I said any man or woman.

Q. You definitely have that feeling about Mr. Yount at this time—that he is innocent?

A. He would have to be innocent until proven guilty. Transcript at 69.

JUROR NO. 2—*Clair Clapsaddle*

Q. You have formed some opinion?

A. Well, yes.

Q. Now, is that opinion rather firm and fixed in your mind?

A. Well, I couldn't say it would be, no.

Q. Are you aware of a principle of law we have in Pennsylvania that says an individual who is accused of a crime is presumed innocent until proven guilty—are you aware of that?

A. Yes sir.

Q. Would your present opinion be such that you could accept that general rule that Mr. Yount is presently presumed innocent until proven guilty?

A. That's the way it's suppose to be and.

Q. Assuming it is supposed to be one way—my question is, will you accept it?

A. Yes.

Q. Would you?

A. Yes.

Transcript at 206–207.

\*   \*   \*   \*   \*   \*

Q. Is there anything you know of at this time which would influence your judgment in this case if you were a juror other than the evidence which would come forth in this case at this time?

A. No.

Q. Mr. Clapsaddle, at one point you did indicate you had had some opinion?

A. Yes.

Q. Are you able to erase that opinion from your mind now and afford the defendant the presumption of innocence?

A. Yes I could, yes.

Q. Having been informed again, let me just say this once more—having been informed now that the defendant is entitled to this presumption of innocence that I mentioned to you, have you erased your opinion and are you now affording the defendant that presumption?

A. That he is innocent?

Q. Yes, until proven guilty?

A. Yes.

Transcript at 210–211.

### JUROR NO. 3—*John Yorke*

Q. Mr. Yorke, do you know of the matter involving Jon Young?

A. No.

Q. Have you read anything about Mr. Yount?

A. No.

Q. You don't know anything about the reason why you're here—or why you were called to come here as a prospective juror?

A. No I don't know.

Q. Have you read anything in the newspaper about it?

A. No.

Q. Have you heard any discussions or heard any radio broadcasts about it?

A.. No.

Transcript at 370.

\*   \*   \*   \*   \*   \*

Q. Mr. Yorke, do you have any opinion as to this case that we're talking about. Do you know what case we're talking about now?

A. Yes, it's a Mr. Yon you say.

Q. Jon E. Yount?

A. Yes, Jon Yount.

Q. Do you have any reason—strike that—do you have any opinion as to his guilt or innocence?

A. No I have no opinion?

Q. You have no opinion at all?

A. No.

Transcript at 376.

### JUROR NO. 4—*Mary Jane Waple*

Q. Do you Mrs. Waple, presently at this time, have an opinion about Mr. Yount's guilt or innocence?

A. No.

Q. You don't have any opinion at all?

A. I don't know anything about the man or about this case, only what I have read years ago and hardly remember that.

Q. Well you do remember something based upon what you read and heard several years ago—is that true?

A. Yes.

Q. Does that cause you to have an opinion at this time about him—without telling what your opinion is?

A. I don't have an opinion.

Q. You don't have any opinion?

A. No. I just don't know.

Q. You don't know what?

A. I don't know if he's innocent or guilty.

Q. I'm not asking you that.

A. I don't have an opinion. I'm not judging him.

Transcript at 412.

### JUROR NO. 5—*James F. Hrin*

Q. Let me ask—if you were to be selected as a juror in this case and take the jury box, could you erase or remove the opinion you now hold and render a verdict based solely on the evidence and law produced at this trial?

A. It is very possible. I wouldn't say for sure.

Q. Do you think you could?

A. I think I possibly could.

Q. Then the opinion you hold is not necessarily a fixed and immobile opinion?

A. I would say not, because I work at a job where I have to change my mind constantly.

Q. Can you enter the jury box with an open mind prepared to find your verdict on the evidence as presented at trial and the law presented by the Judge?

A. That I could do.

    \*     \*     \*     \*     \*     \*

Q. Did I understand Mr. Hrin you would require some—you would require evidence or something before you could change your opinion you now have?

A. Definitely. If the facts show a difference from what I had originally—had been led to believe, I would definitely change my mind.

Q. But until you're shown those facts, you would not change your mind—is that your position?

A. Well—I have nothing else to go on.

Q. I understand. Then the answer is yes—you would not change your mind until you were presented facts?

A. Right, but I would enter it with an open mind.

Transcript at 441–442.

### JUROR NO. 6—*Martin Karetski*

Q. Do you have an opinion today as to his guilt or innocence?

A. It's been a long time ago and I'm not too sure now. It was in the paper he plead not guilty.

Q. What you just read the other day—

A. I think about Tuesday or Wednesday's paper.

Q. So based upon what you read about it a long time ago as well as what you read about it within the last few days, do you have an opinion as to his guilt or innocence?

A. Honestly, I couldn't say now.

Q. Are you saying you don't have an opinion or don't know if you have an opinion?

A. I probably don't know if I have an opinion.

Q. Let me ask you this then. In case you do have an opinion, could you wipe it out of your mind—erase it out of your mind before you would take a seat in the jury box and hear whatever evidence you might hear?

A. As it is right now I have no opinion now—four or five years ago I probably did but right now I don't.

Transcript at 561–562.

### JUROR NO. 7—*Julia C. Hummel*

Q. Then you do have an opinion regardless of what it was based on—do you have an opinion right now?

A. I really don't know what to say. I don't know what would be the truth, whether to say yes or no.

Q. You mean you can't tell which would be the truth and which would not be the truth?

A. I can't say that he was guilty or that he wasn't.

Q. I'm not asking you that. I'm asking whether or not you have an opinion as to which it is, without telling me which opinion you have. Do you have an opinion as of right now?

A. No.

Transcript at 792–793.

### JUROR NO. 8—*Mrs. Jessie M. Parks*

Q. During the process of thinking about it and before you went through the process

of thinking less and less about it, did you form any opinion as to the guilt or innocence of Mr. Yount?

A. Well, truthfully I can say this. I felt this way about it. You know they say there's two sides to every story. Like they say, our Courts are here until the man is proved guilty or innocent and I felt this way—and in a lot of ways it didn't jibe with me and in a lot of ways it did. I can't say he's guilty or I can't say he isn't guilty and that's what my opinion is. I'm not saying yes or no. But I felt that I wouldn't want to be on the jury but then I felt—if it was my duty and I would be called I would do the best of my ability but here is Judge Cherry this morning—his summation of it. I can't exactly say in his words—either you have to prove whether he is guilty or whether he isn't. If you can remember what you said when you talked—I'm sorry—what I mean—you can say well he is, but when you get to thinking can you truly say until you actually know. When the trial was on I didn't read any of it and I didn't get up the assumption to say he's guilty and I can't say he isn't guilty. It's just the same thing and—but so—that's the way I feel about it. Now, as far as my opinion which you want, well, I would definitely have to hear it before I could say one way or other. If I'm selected that's okay and if you don't think I'm qualified that's okay too.

Transcript at 814.

JUROR NO. 9—*Albert I. Undercoffer.*

Q. Well, taking all of these factors into consideration as you have Mr. Undercoffer, would you give it a little bit of thought now and tell me whether or not you have an opinion as of right now, just based upon what you know and have heard and thought about. Do you have an opinion as of right now as to his guilt or innocence?

A. No. I think I would have to hear the testimony of both sides and I think I would form my opinion after I hear the testimony of both sides.

\* \* · \* \* \* \*

A. It's a little bit like the Court, if somebody makes a statement in Court, the Judge would say, strike that from the record. The jury would be supposed to forget about that. It would be a very difficult thing to do.

Q. It sure is. We have been trying to battle that one for years.

A. I believe for myself—I believe that I could. I would be capable of rendering a fair decision on what I had heard here. I have faith enough in myself.

Transcript at 857–858.

JUROR NO. 10—*Robert P. Murphy*

Q. Have you formed an opinion as to the guilt or innocence of this defendant?

A. No I have not.

Q. May I assume then Mr. Murphy, if you were selected as a juror you could go into the jury box and base your verdict solely on the testimony and evidence along with the instructions that the Judge would give you?

A. That's true.

Q. And that you would carry no opinion with you into the jury box?

A. No.

Transcript at 922.

JUROR NO. 11—*Irene Kurtz*

Q. Have you formed an opinion as to the innocence or guilt of this defendant?

A. No.

Q. If you were selected to sit as a juror, would you be able to base your verdict solely—only on the testimony and evidence you would hear and the instructions the Judge would give you?

A. Yes.

Q. And that no prior information or idea you may have would enter into your deliberation?

A. No.

Transcript at 988.

JUROR NO. 12—*John T. Harchak*

Q. Have you formed an opinion as to the guilt or innocence of this defendant?

A. No I haven't.

Q. Mr. Harchak, if you were selected as a juror in this case, would you be able to enter the jury box and base your verdict of guilty or innocent only on the evidence and testimony that you would hear along with the instructions that the Judge would give you?

A. Yes.

Q. And you would have no other influencing factors in arriving at your verdict?

A. No, other than the testimony I would hear in this Court Room.

Transcript at 1119.

■ These responses not only meet the test of *Murphy* and *Martin* but refute petitioner's assertion that he failed to obtain a fair and "indifferent" jury in Clearfield County. Moreover, his assertion of substantial community bias and presumptive prejudice is belied by the record. The state court initially summoned seventy-three prospective jurors. The trial judge excused fifty-six for cause and Yount exercised nine peremptory challenges. The Commonwealth exercised one peremptory challenge and four jurors were seated, after one seated juror was excused due to a death of a family member. These percentages are not remarkable to anyone familiar with the difficulty in selecting a homicide jury in Pennsylvania[1] and we find neither an abuse of discretion nor a constitutional violation when the trial judge determined to summon additional jurors while denying Yount's motions to change venue.

The trial court and counsel interrogated an additional sixty-eight citizens, or one hundred forty-one in total, before a jury was selected. Twenty-three peremptory challenges had been exercised. Extensive latitude was granted during voir dire to ascertain the "mental attitude of appropriate indifference," *Irvin v. Dowd*, 366 U.S. at 724–25, 81 S.Ct. at 1643–1644, and we find nothing in the pretrial publicity, or the responses of the citizens who were excused for cause, or the number of such recusals, or

the attitudes of the jurors who were seated, that leads to the conclusion that the venire was presumptively prejudiced so as to require a change of venue. We hold that petitioner has failed to sustain his burden of proving that the trial court committed constitutional error when it denied the motions to change venue. Petitioner has failed to establish that community bias prevented the selection of an impartial jury in Clearfield County in contravention of the Fourteenth Amendment.

C.

Petitioner's final argument relates to the trial court's decision to deny certain challenges for cause thereby requiring the accused to exercise peremptory challenges. We find no constitutional infirmity in this regard.

■ Irene Kurtz and John T. Harchak were seated as jurors after Yount had exhausted his discretionary challenges. But as we have noted, a challenge for cause with respect to both jurors was not constitutionally required. Kurtz stated that she maintained no opinion as to guilt, and further that she was able to decide the case solely upon the evidence presented. Transcript at 988. The testimony of Harchak is to the same effect. Transcript at 1119. The decision of the trial judge was a discretionary function and did not implicate the Fourteenth Amendment.

Petitioner also urges that a challenge for cause was constitutionally required with regard to potential jurors Marcia Polkinghorn, James F. Decker, Marie E. Richardson and Ruth I. Hudson. None of these persons were seated as jurors but Yount claims that he was required to utilize discretionary challenges due to the trial court's erroneous rulings.

Marcia Polkinghorn testified that she had an opinion of guilt following publication of the prior adjudication. Transcript at 755–56. Further that she would "try" to defer

---

1. As was done here, Pennsylvania law requires individual voir dire beyond the presence of other jurors; under oath; recorded; and with the participation of the court and counsel. Pa.R. Crim.P. 1106.

her opinion in deference to the law and facts presented in court. Transcript at 764. James Decker indicated that he was of the mind that Jon Yount was guilty. Transcript at 898, 900. But he also testified that he would "try the case solely on the evidence and law." Transcript at 901. Marie Richardson observed that she had no opinion as to guilt, Transcript at 957, but she preferred not to serve due to anxiety as well as a recent death in the family. Transcript at 964. Finally, Ruth Hudson responded that she had a fixed opinion of guilt, Transcript at 1113, but she also testified that she was willing and able to set aside her opinion and base a verdict solely upon the evidence. Transcript at 1113–1114. Yount's challenges for cause were denied in each instance.

■ None of these citizens sat in judgment of the facts because the accused exercised one of the twenty peremptory challenges provided by Pennsylvania law. In addition, no authority is required for the precept that the grant or denial of a challenge for cause is a discretionary function of the trial judge. Only when an accused is denied a fair and impartial tribunal is the Fourteenth Amendment implicated. We find no such violation here.

■ The decision of the judge to deny a cause challenge to Marie Richardson was proper. Physical capacity to serve is a judicial decision and not one to be left to the judgment of an individual juror. The trial judge found that Richardson was capable of serving on a sequestered jury and we perceive no constitutional error in that ruling.

■ The denial of petitioner's challenges for cause as to Polkinghorn, Decker and Hudson did not violate the Fourteenth Amendment even if we may disagree with those rulings. First, the trial judge granted challenges for cause prior to and following the interrogation of these prospective jurors. See Transcript at 1161. Second, Yount retained additional peremptory challenges following the no cause rulings concerning all three prospective jurors. Third, petitioner exercised a peremptory challenge to Margaret Rokosky, Transcript at 1138, after he exercised a similar challenge as to Ruth Hudson. And fourth, the jurors and alternates who were seated after petitioner had exhausted his peremptory challenges met the test of *Murphy v. Florida,* 421 U.S. 794, 799–803, 95 S.Ct. 2031, 2035–2037, 44 L.Ed.2d 652 (1974) and *Martin v. Warden,* 653 F.2d 799 (3d Cir. 1981). We hold that petitioner has failed to sustain his burden of proving the substantive elements of his claim.

In sum, we hold the petitioner, Jon Yount, has failed to establish that: (1) excessive and biased pretrial publicity prevented a fair trial; (2) substantial and undue community bias required a change of venue; and (3) the trial court erred when it denied several challenges for cause. Petitioner's exhausted state claims assail, in part, the factual findings of an experienced trial judge and an appellate jurist of renown. We find an absence of convincing evidence to contradict their findings and we further hold, based on an independent review of the record, that petitioner has failed to establish that this state court judgment is violative of the Due Process Clause of the Fourteenth Amendment.

A written order will follow denying the petition for habeas relief with prejudice.