Jon E. YOUNT, Appellant,

v.

Ernest S. PATTON, Superintendent, SCI—
Camp Hill, and Harvey Bartle III, Attor-
ney General of the Commonwealth of
Pennsylvania, Appellees.

No. 82–5372.

United States Court of Appeals,
Third Circuit.

Argued Dec. 17, 1982.

Decided May 10, 1983.*

Certiorari Granted Oct. 17, 1983.

See 104 S.Ct. 272.

---

* Due to illness, Judge Garth separately filed his opinion concurring in the judgment on June 10, 1983.

George E. Schumacher, Federal Public Defender, (argued), Pittsburgh, Pa., for appellant.

F. Cortez Bell, III, Asst. Dist. Atty., (argued), Thomas F. Morgan, Dist. Atty., Clearfield, Pa., for appellees.

Before HUNTER and GARTH, Circuit Judges and STERN,** District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Petitioner Jon E. Yount was convicted in 1966 of first degree murder and rape in the Court of Oyer and Terminer and General Jail Delivery of Clearfield County, Pennsylvania. On direct appeal the Pennsylvania Supreme Court determined that petitioner had not received adequate warnings against self-incrimination. It reversed the judgment of sentence and granted a new trial. *Commonwealth v. Yount,* 435 Pa. 276, 256 A.2d 464 (1969), *cert. denied,* 397 U.S. 925, 90 S.Ct. 918, 25 L.Ed.2d 104 (1970) ("*Yount I*"). After a retrial before the same court, petitioner was convicted of first degree murder and was again sentenced to life imprisonment. The Pennsylvania Supreme Court on direct appeal affirmed the judgment of sentence. *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974) ("*Yount II*").

In 1981 petitioner filed a petition for a writ of habeas corpus in United States District Court.[1] Petitioner alleged, *inter alia,* that his conviction had been obtained in violation of his fifth and fourteenth amendment privilege against self-incrimination and his sixth and fourteenth amendment right to a fair trial by an impartial jury.[2] The federal magistrate concluded that petitioner's privilege against self-incrimination had not been violated, but recommended

---

** Honorable Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

1. The petition was initially filed in the Middle District of Pennsylvania, but was transferred to the Western District of Pennsylvania pursuant to 28 U.S.C. § 2241(d) (1976).

2. None of petitioner's other allegations are before us. Petitioner does not appeal the district court's rejection of his challenges to the trial court's instructions on the degrees of homicide and on the murder weapon. *See Yount v. Patton,* 537 F.Supp. 873, 875 (W.D.Pa.1982); app. at 134a. All other claims by petitioner, including his attack on the use of character evidence at trial, his allegation of a prejudicial charge by the court, and his claim of ineffective assistance of counsel, were deleted on petitioner's motion after the district court determined that the claims had not been presented to the courts of Pennsylvania for their initial consideration. *See* 537 F.Supp. at 874–75; *see* app. at 126a–27a, 154a.

that the petition be granted because petitioner had been denied a fair and impartial jury. App. at 124a–41a. The district court agreed on the former issue, rejected the magistrate's recommendation on the latter issue, and denied the petition. *Yount v. Patton*, 537 F.Supp. 873 (W.D.Pa.1982).

We agree with the district court that petitioner's privilege against self-incrimination was not infringed. We conclude, however, that the petitioner's right to trial by a fair and impartial jury was violated. We will therefore remand that portion of the case to the district court.

## I. SELF–INCRIMINATION

### A. *Facts*[3]

During the early evening of April 28, 1966, the body of Pamela Rimer, an 18-year old high school student, was found in a wooded area near her home in Luthersburg, Clearfield County. There were numerous wounds about her head, apparently caused by a blunt instrument. There were also cuts caused by a sharp instrument on her throat and neck. One of her stockings was knotted and tied around her neck. An autopsy showed that she had died of strangulation when blood from the throat and neck wounds was drawn into the lungs. Except for her stocking and shoe she remained fully clothed. The autopsy revealed no indication that she had been sexually assaulted.

Neighbors gave state police a description of a station wagon which they had seen at approximately the time and place at which the body was found. *E.g.*, Testimony of Trial beginning November 17, 1970, at 143–48 ("T.T."). Sometime after two o'clock on the morning of April 29, 1966, state police-

men learned that petitioner, the victim's high school mathematics teacher, had on prior occasions been seen in a station wagon fitting that description. T.T. at 290–93; Transcript of Proceedings—August 17, 1970, at 17–18, 20–21 ("T.P.").

At approximately 5:45 that morning, petitioner voluntarily appeared at the State Police Substation in DuBois, Clearfield County. The occupants of the substation had participated in the investigation of the Rimer homicide, T.T. at 198–201, 203–05, 255–56, but had gone to sleep unaware of any link between the homicide and petitioner or his vehicle. T.T. at 275, 277; T.P. at 13, 20.[4] Petitioner rang the doorbell. A trooper awoke, opened the door and asked whether he could be of assistance. Petitioner stated, "I am the man you are looking for." The trooper asked petitioner to repeat what he had said, app. at 11a; T.T. at 250–51, and then asked whether petitioner was referring to "the incident in Luthersburg." Petitioner said yes. The trooper then asked petitioner to come in and be seated.

Leaving petitioner unattended, the trooper went to a back bedroom and roused a detective and a second trooper. The first trooper informed them that "there was a man in the front that said we are looking for him" in connection with the Luthersburg incident. *See* T.T. at 276; T.P. at 6. The first trooper then returned to the front office where petitioner had removed his coat, hat and gloves. The trooper asked petitioner for his identification. Petitioner gave the trooper his wallet, which the trooper returned after removing petitioner's automobile operator's license. T.T. at 252.

---

**3.** The federal magistrate adopted the statement of the facts given in the opinion of the Pennsylvania Supreme Court in *Yount II*, 455 Pa. at 306–08, 314 A.2d at 244–45. App. at 128a. We too adopt that statement. In addition we on occasion cite directly to the record for certain details omitted in the supreme court's summary. Unless otherwise noted, those details are undisputed.

**4.** Petitioner asserts that before he came to the substation, the state policemen there knew that he and his vehicle had been linked to the scene

of the crime. Appellant's Brief at 33. The trial court found, however, that when petitioner appeared at the substation "there was no knowledge on the part of the Police [at the substation] that he 'was the one they were looking for.'" App. at 754a. The Pennsylvania Supreme Court stated that the state policemen who had discovered that petitioner's automobile fit the neighbors' description had been working entirely separately and in a different location. *Yount II*, 455 Pa. at 309–10, 314, 314 A.2d at 246, 248.

Shortly thereafter, the detective and the second trooper entered the front office. The detective was handed petitioner's license and learned that petitioner was Jon Yount. App. at 12a; T.T. at 259, 262–63, 271. The detective requested that petitioner be seated inside a smaller adjacent office, and gave petitioner something to eat. *See Yount I,* 435 Pa. at 278, 256 A.2d at 465; T.P. at 15. The detective asked, "Why are we looking for you?" Petitioner replied, "I killed that girl." Upon hearing that answer, the detective inquired, "What girl?", and petitioner responded, "Pamela Rimer."

The detective then asked, "How did you kill this girl?" Petitioner answered, "I struck her with a wrench and I choked her." At that time the detective undertook to advise petitioner of his rights. The detective, however, failed to tell petitioner of his right to court-appointed counsel if he could not afford his own attorney. The detective then conducted an interrogation regarding the details of the crime. At some point the second trooper searched petitioner and confiscated his penknife. T.T. at 265–66, 267–68, 272–73.[5] Petitioner gave his first written confession to the detective. Later the district attorney, after giving similarly inadequate warnings, questioned petitioner and obtained another written confession.

B. *State Proceedings and Proceedings Below*

Before the first trial petitioner moved to suppress his statements and confessions as violative of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After a hearing the motion was denied. The petitioner's statements and confessions were admitted in the first trial over petitioner's objections.

The Pennsylvania Supreme Court held that the warnings given by the detective and district attorney were inadequate under *Miranda. Yount I,* 435 Pa. at 279, 256 A.2d at 465 (Roberts, J., plurality opinion). The

court rejected the Commonwealth's argument that the confessions were volunteered. "After indicating a willingness to talk, [petitioner] was *interrogated* about details of the crime, and his formal confession followed." 435 Pa. at 279–80, 256 A.2d at 465 (emphasis in original); *see* 435 Pa. at 281, 256 A.2d at 468 (Jones, C.J., concurring). The court found the confessions invalid and granted a new trial. 435 Pa. at 281, 256 A.2d at 466.

Prior to the second trial petitioner requested that his oral and written statements be suppressed. The trial court on the authority of *Yount I* suppressed the written confessions, as well as the question "How did you kill this girl?" and its answer. The trial court ruled, however, that petitioner's statement "I killed that girl" and his identification of "that girl" as "Pamela Rimer" were admissible under *Yount I.* App. at 748a, 755a. It concluded that petitioner's statements were made before petitioner was in custody. App. at 755a.

On appeal the Pennsylvania Supreme Court did not determine whether petitioner was in "custody" when he made the statements to the detective. *Yount II,* 455 Pa. at 311 n. 4, 314 A.2d at 247 n. 4. Instead it ruled that the statements were volunteered and not the product of interrogation. The court said that the detective's first question, "Why are we looking for you?", was simply an extemporaneous response "of neutral character." 455 Pa. at 310, 314 A.2d at 246. In the court's view the detective's question "What girl?" after petitioner had responded, "I killed that girl," was merely "a clarifying inquiry." *Id.* The supreme court therefore concluded that the questions were not calculated, expected or likely to elicit an incriminating response. 455 Pa. at 309, 314 A.2d at 246.

In his petition for a writ of habeas corpus, petitioner again argued that his fifth and fourteenth amendment privilege against self-incrimination had been violated by the admission of his responses to the

---

5. Petitioner argues that the state police searched him and confiscated his penknife *before* the detective asked, "Why are we looking for you?" Appellant's Brief at 32. Although there have been no explicit factual findings as to when the search occurred, petitioner's assertion has been implicitly rejected in the factual findings and holding of the state trial court and the district court, and is not fairly supported by the record.

detective's questions. The magistrate ruled that the responses were properly admitted because only after those responses, when "the police recognized that petitioner was present to confess his participation in a crime, did his presence become custodial." App. at 132a. The magistrate did not consider whether the questions constituted interrogation. The district court adopted the magistrate's findings. 537 F.Supp. at 875.

### C. *Discussion*

*Miranda* held that unless the government has advised a defendant of his rights, it cannot put into evidence statements stemming from the "custodial interrogation" of the defendant. 384 U.S. at 444, 86 S.Ct. at 1612. The Supreme Court defined "custodial interrogation" to mean

> questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Id.* (note omitted).

Petitioner argues on appeal that his statements "I killed that girl" and "Pamela Rimer" must be excluded as the products of custodial interrogation. He contends that the detective's questions constituted "interrogation," and asserts that the state policemen would not have allowed him to leave the substation when the questions were posed. We need not consider whether the questions "Why are we looking for you?" and "What girl?" constituted interrogation under *Miranda* because we conclude that petitioner was not in "custody" until after he had answered those questions. *See Beckwith v. United States,* 425 U.S. 341, 345–46, 96 S.Ct. 1612, 1615–1616, 48 L.Ed.2d 1 (1976); *United States v. Mesa,* 638 F.2d 582, 588 (3d Cir.1980) (opinion of Seitz, C.J.).

▮ To determine whether an individual is in custody, we use the "objective test of whether the 'government has in some meaningful way imposed restraints on [a person's] freedom of action.'" *Steigler v. Anderson,* 496 F.2d 793, 798 (3d Cir.) (quoting *United States v. Jaskiewicz,* 433 F.2d 415, 419 (3d Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971)), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 320, 42

L.Ed.2d 277 (1974). Where, as here, the individual has not been openly arrested when the statements are made,

> something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart.

*Id.* at 799 (quoting *United States v. Hall,* 421 F.2d 540, 545 (2d Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970)); *accord Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam); *see Mesa,* 638 F.2d at 587 n. 4 (opinion of Seitz, C.J.). When the questioning occurs in a police station we must scrutinize the circumstances surrounding the statements with extreme care for any taint of psychological compulsion or intimidation. *Steigler,* 496 F.2d at 799.

In making our determination, we are mindful of the Supreme Court's caution that "custody" must not be read too broadly:

> [P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.

*Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *accord Steigler,* 496 F.2d at 799. In particular we note the Court's statement in *Miranda:*

> There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statements he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478, 86 S.Ct. at 1630 (note omitted).

▮ Petitioner came voluntarily and on his own initiative to the substation. The state police did not know why he was there. The first trooper left petitioner unattended

while petitioner on his own accord removed his outer clothing. The detective testified that before he posed the questions he would have returned petitioner's operator's license and allowed him to leave had petitioner so requested. T.P. at 15–16. On this record we have no difficulty in concluding that petitioner was not in custody when the detective asked, "Why are we looking for you?" *Sullivan v. Alabama,* 666 F.2d 478, 482 (11th Cir.1982); *see Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *Orozco v. Texas,* 394 U.S. 324, 325, 89 S.Ct. 1095, 1096, 22 L.Ed.2d 311 (1969); *Barfield v. Alabama,* 552 F.2d 1114, 1118 (5th Cir.1977). The admission of petitioner's response to that question therefore did not violate his fifth and fourteenth amendment privilege against self-incrimination.

■ Petitioner's response, "I killed that girl," was obviously highly incriminating. Although such an incriminating response undoubtedly heightened the detective's suspicion, it is police compulsion, and not the strength of police suspicions, which places a suspect in custody. *See Beckwith,* 425 U.S. at 346–47, 96 S.Ct. at 1616–1617.

> The more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda* . . . . But this is simply one circumstance, to be weighed with all the others.

*Steigler,* 496 F.2d at 799–800 (quoting *Hall,* 421 F.2d at 545).

The detective testified that petitioner remained free to leave the substation when the detective asked, "What girl?" T.P. at 5. The detective explained that only after petitioner gave the name of the girl and how he had killed her could the detective determine that the petitioner was not merely seeking personal aggrandizement by confessing to a sensational crime in which he had no part. T.P. at 3–4. Petitioner, on the other hand, does not allege that the state police did "anything different" after he had stated, "I killed that girl." *See*

Brief for Petitioner on Petition for Writ of Habeas Corpus at 19–20, 22–23 ("Brief for Petitioner"). Instead petitioner takes the position that he was in custody from the moment he identified himself, and that "either all the statements were voluntary or all were involuntary." *Id.* at 19; *see* Appellant's Brief at 33. In addition, we can find no evidence that the detective at that juncture used any additional "force or intimidation, physical or psychological, actual or implied," *Government of Virgin Islands v. Berne,* 412 F.2d 1055, 1060 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969).

Both the state trial court and the federal magistrate concluded that petitioner was not in custody until he responded, "Pamela Rimer." The district court agreed. After examining the peculiar factual circumstances of this case we cannot conclude that the district court erred. We therefore hold that petitioner's privilege against self-incrimination was not violated by the admission of his statements "I killed that girl" and "Pamela Rimer."

## II. FAIR AND IMPARTIAL JURY

### A. *Facts and State Proceedings*

Clearfield County is a rural county with a population of approximately seventy thousand served by two newspapers with a total circulation of approximately twenty-five thousand. On April 29, 1966, each of the newspapers devoted its front page to the Rimer homicide and to petitioner's appearance at the substation. Both newspapers gave front-page coverage to the pre-trial proceedings, the voir dire of 104 veniremen, and the nine-day trial. In the DuBois *Courier Express* the publicity culminated in seventeen consecutive editions each bearing banner headlines and carrying at least two feature articles. The Clearfield *Progress* gave the case similarly intense coverage. As the papers related, public interest in the proceedings was unprecedented; *The Progress* later adjudged petitioner's trial the top news item of 1966.[6]

---

**6.** The case also received publicity in radio and television broadcasts, as well as in out-of-state and national publications.

The coverage was as detailed as it was extensive, see app. at 135a, 136a. The newspapers related in full petitioner's detailed written confessions as well as his testimony at trial retelling the homicide. They also detailed petitioner's defense of temporary insanity, the charge and evidence of rape, and finally petitioner's conviction on October 7, 1966, of both rape and first-degree murder.

Petitioner's cause continued to receive front-page coverage at every step of his appeal. Banner headlines announced the reversal of the conviction in *Yount I.* The dissent was reprinted in full, and a local radio program became a forum in which callers expressed their hostility to petitioner. As the second trial approached, newspaper coverage increased. The selection of each juror merited an article and often a profile. By the close of voir dire the two newspapers had printed sixty-six front-page articles on the appeal and retrial.[7]

Petitioner was returned to Clearfield for retrial before the same judge. On May 5, 1970, petitioner requested a change of venue. He claimed that the publicity which had saturated the county since the murder, and the continuing discussion of the case among residents, made a fair trial in Clearfield County impossible. In particular, petitioner alleged that the dissemination of prejudicial information outside of evidence was so widespread that it could not be eradicated from the minds of potential jurors. The prosecution argued in response that the case had received so much publicity across the state that it would be useless to change the venue. The trial court found that after the initiation of the appeal the newspapers had merely publicized the actions of the courts "without editorial comment of any kind." App. at 748a–49a. It denied the petition for change of venue on September 12, 1970.

Jury selection began on November 4, 1970, and took ten days, seven jury panels, 292 veniremen and 1186 pages of testimony. One hundred and twenty-five of the 292 veniremen were excused because they had not been chosen properly. Four others were dismissed for cause before they were questioned on the case. Of the 163 remaining veniremen who were questioned, all but two had read of the case in the newspapers, had heard about it on radio or television, or were otherwise familiar with it. See app. at 135a, 137a. When asked whether they had discussed the case, had heard it discussed, or had heard others express their opinion as to petitioner's guilt or innocence, over ninety percent said that they had. See app. at 135a, 137a.[8]

Of the 163 veniremen questioned on the case, 121 were dismissed for cause.[9] Ninety-six of those 121 veniremen were successfully challenged after they testified that they had firm and fixed opinions[10] which could not be changed regardless of what evidence was presented. See app. at 135a & n. 13.[11] An additional 21 of the 121 veniremen were dismissed for cause after they said that they had an opinion which they could change only if the petitioner could convince them to do so. See app. at 135a–36a & nn. 14, 15.[12] Thus 117 out of the 163

---

**7.** Petitioner's second trial and his subsequent efforts to gain retrial or parole also received front-page coverage. Those efforts have provoked substantial community protest in Clearfield County. App. at 137a & n. 16. The magistrate found that even "at this late date, fifteen years after the crime, there is considerable public feeling in Clearfield County in opposition to the petitioner." App. at 136a–37a.

**8.** Ninety-six veniremen were asked, and 88 responded affirmatively.

**9.** Petitioner made 114 successful challenges, the prosecution seven.

**10.** After objection by respondent, petitioner was not permitted to ask each venireman what his opinion was. See Transcript of Trial—Voir Dire at 86; Brief for Appellee at 13; Brief for Petitioner at 27–28. Many veniremen nonetheless volunteered that they thought petitioner was guilty because he had confessed to the crime or because he had been convicted in the first trial. Other veniremen remembered hearing members of the public express the opinion that petitioner was guilty. No venireman said he thought petitioner was not guilty.

**11.** Petitioner challenged 90 of those 96 veniremen. The prosecution challenged the remaining six.

**12.** Petitioner successfully challenged all 21 veniremen.

veniremen questioned were successfully challenged for cause after they said they could not set their opinion aside before entering the jury box.

There were also nine other veniremen, unsuccessfully challenged for cause by petitioner, who indicated that they had an opinion which they could change only if the petitioner could convince them to do so.[13] When we combine those nine with the 117 veniremen dismissed for cause, we find that a total of 126 out of the 163 veniremen questioned on the case were willing to admit on voir dire that they would carry their opinion into the jury box.[14]

Voir dire gave other indications of the depth of community sentiment. One venireman, the wife of a minister, testified that she had heard too many opinions to be sure of her own. She was then asked:

Q. Would your presence in serving as a juror create a difficulty in your parish?

A. Why yes—when people heard my name was on for this—countless people of the church have come to me and said they hoped I would take—the stand I would take in case I was called. I have had a prejudice built up from the people in the church.

Q. Is this prejudice, has it been adverse to Mr. Yount?

A. Yes it was. They all say he had a fair trial and he got a fair sentence. He's lucky he didn't get the chair.

\* \* \* \* \* \*

[T]he church people—I haven't asked for any of this but they discuss it in every group—but they say now since you are chosen and you will be there we expect you to follow through.

Q. Notwithstanding what the court would tell you, you feel you would be subject to the retributions or retaliation of these people—

A. I think I would hear about it. App. at 410a, 412a. Another prospective juror said that his opinion had been erased by the passage of time, but his daughter-in-law later testified that he had left for jury duty voicing great animosity toward petitioner. App. at 430a, 527a–28a.

After the first jury panel was exhausted, petitioner again moved for a change of venue. Although more than three quarters of the veniremen already questioned had admitted that they would carry an opinion into the jury box, the court orally denied the motion. On November 14, 1970, the trial court rejected petitioner's written motion for a change of venue. In its memorandum opinion, the trial court explained that the still-incomplete voir dire had taken so much time and covered so many veniremen because the court had been lenient in permitting extended examination of prospective jurors and in granting challenges for cause. App. at 194a–95a. It said that "almost all, if not all, jurors seated had no prior or present fixed opinions." App. at 196a. The court noted

that it has been 4 years since the first trial of this cause, and so far as this Court can recall, there has been little, if any, talk in public concerning the trial from that time to the time when it was announced that a trial date had been fixed.

*Id.* The trial judge found the publicity was not unfair to the petitioner. App. at 197a. He added that few spectators had attended voir dire, which he took as some indication "particularly in a community as small as ours" that the publicity had not had a great effect. *Id.*

In fact the publicity had reached all but one of the twelve jurors and two alternates finally empanelled.[15] Juror No. 1 said that

---

**13.** Petitioner peremptorily challenged six of those nine veniremen, one was seated as a juror, and the remaining two were seated as alternates after petitioner had exhausted his peremptory challenges.

**14.** In addition, we note that twelve other veniremen stated that they had had an opinion at one time but claimed they would not carry it into the jury box. One of the twelve veniremen was dismissed for cause, six were peremptorily

challenged by petitioner, and five were seated as jurors.

**15.** Juror No. 1 stated that "it was pretty hard to be here in Clearfield County and not read something in the paper." App. at 202a. Juror No. 2 said that "[y]ou could hardly miss it" on the radio and television news. App. at 212a. Juror No. 6 volunteered that "[i]t's rather difficult to live in DuBois and get the paper and

he had read about the case and heard others express their opinions, but had never come to a "true" opinion. App. at 202a–04a, 207a. Juror No. 2 testified that he had recently discussed the case with others and had formed an opinion which was not firm and fixed and could be set aside. App. at 212a–15a, 218a–19a. The next of the jurors to be selected, Juror No. 4,[16] had recently moved into Clearfield County and had never heard about the case. App. at 246a–52a. Juror No. 5 said that she "remembered that they had said he was guilty before" and wondered why petitioner was getting a new trial, but had no opinion and would try to forget what she knew. App. at 259a–63a.

Juror No. 6, James F. Hrin, testified that he had an opinion. He was then asked:

Q. Would you be able to change your mind regarding your opinion before becoming a juror in this case? That's the way I must have you answer the question.

A. If the facts were so presented I definitely could change my mind.

Q. Would you say you could enter the jury box presuming him to be innocent?

A. It would be rather difficult for me to answer.

Q. Can you enter the jury box with an open mind prepared to find your verdict on the evidence as presented at trial and the law presented by the Judge?

A. That I could do.

\*     \*     \*     \*     \*     \*

Q. Did I understand Mr. Hrin you would require some—you would require evidence or something before you could change your opinion you now have?

A. Definitely. If the facts show a difference from what I had originally had been led to believe, I would definitely change my mind.

Q. But until you're shown those facts, you would not change your mind—is that your position?

A. Well—I have nothing else to go on. App. at 271a–73a. After repeatedly reiterating that he would need evidence to change his opinion, Juror Hrin said, "I don't know if that's the answer you want." App. at 275a. Finally when asked yet again whether he could set his opinion aside, he replied, "I have to." App. at 276a. The court denied petitioner's challenge for cause, app. at 274a–75a, and petitioner did not exercise a peremptory challenge.

Juror No. 7 said that he had formed an opinion but added that he was not sure that he still had an opinion or that he could forget what he knew. App. at 285a–88a, 298a–99a. Juror No. 8 had heard others discussing the case and had had an opinion. App. at 304a–05a. She testified that she had none at present except "what he said himself—that he was guilty." App. at 309a–10a. She then said that she did not think she would consider in deliberations what she already knew. App. at 312a–13a. Juror No. 9 said that she had thought petitioner was guilty and wondered why a new trial was necessary, but added that now she would have to hear both sides before she could decide. App. at 322a–24a. Juror No. 10 had heard the opinions of others and had expressed his own. He admitted that it would be difficult to strike what he'd heard before, but stated that he felt petitioner should "have every opportunity to prove his innocence." App. at 336a, 338a–39a. Juror No. 11 testified that he had read about the case but had not formed an opinion. App. at 347a, 349a, 357a.[17]

After petitioner had exhausted his peremptory challenges, two jurors and two alternates were seated over his challenges for cause. Both Juror No. 12 and replacement

find out what the people are talking about—at least the local people without having some opinion or at least reserving some opinion." App. at 275a–76a. Several potential jurors gave similar appraisals of the publicity's effect.

16. The venireman initially selected as Juror No. 3 was later excused for personal reasons.

17. Petitioner did not challenge Jurors Nos. 1, 2, 4, 5, and 7–11. At the hearing on the habeas petition, petitioner explained that, because he had believed that a change of venue would not be granted and that a fair and impartial jury was impossible in Clearfield County, he had felt the jurors were "probably about as good as we are going to get." App. at 557a–58a; see Appellant's Brief at 16–17.

Juror No. 3 testified that they had heard about the case but had no opinion. App. at 362a–65a, 224a–28a. Alternate No. 1 stated that he had expressed an opinion which remained firm and fixed and which he would not put out of his mind until evidence was presented. App. at 380a–85a. Alternate No. 2 said that she had a definite opinion which she could not dismiss and which only evidence could change. App. at 395a–97a. Both alternates were sequestered with the jury; the jurors were told that they were free to discuss the case with other jurors when sequestered.

The trial lasted for four days. The prosecution presented quite a different case than it had at the first trial. Because of the Pennsylvania Supreme Court's holding in *Yount I,* the Commonwealth was unable to put into evidence petitioner's detailed written confessions. As a result, it chose not to retry petitioner on the rape charge. *See* 537 F.Supp. at 877.

The change in the defense was even more marked. Petitioner did not take the stand to retell and explain the events revealed in the now-excluded confessions. He did not renew his claim of temporary insanity. Instead petitioner relied solely upon cross-examination and character witnesses.

After he was again sentenced to life imprisonment, petitioner filed a post-conviction motion for a new trial on November 27, 1970. He claimed, *inter alia,* that the trial court erred in rejecting several of his challenges for cause and in denying his petitions for a change of venue. The trial court rejected those arguments and dismissed the motion on January 15, 1973. It stated that there had been "practically no publicity" during the four years between trial and retrial, and "practically no public interest" shown at the second trial as few had attended on some days. App. at 751a. Voir dire had taken such a long time, it ex-

plained, because petitioner "raised so many questions and the court exercised its discretion to assure that there could be no complaint about the final jury empanelled." *Id.*

The Pennsylvania Supreme Court adopted the trial court's post-conviction findings and affirmed the judgment of sentence on January 24, 1974. *Yount II,* 455 Pa. at 311–12, 314 A.2d at 247. It ruled that the petitions for a change of venue were directed to the sound discretion of the trial court, and found no abuse of that discretion because "the record fails to disclose undue community prejudice." *Id.,* 455 Pa. at 312–14, 314 A.2d at 247–48.

B. *Proceedings Below*

In his petition for a writ of habeas corpus, petitioner claimed that his conviction was obtained in violation of his right to a fair, impartial, and "indifferent" jury. In particular, he alleged that the trial court erred by refusing his motions for a change of venue.[18]

After two days of evidentiary hearings, the United States Magistrate recommended that the petition be granted. He noted that the case involved a sensational homicide in a small rural community and that extensive publicity had surrounded both trials. App. at 136a, 141a. He found "a strong community hostility toward the petitioner" as well as "pervasive community knowledge of the facts of the case." *Id.* at 141a. He characterized this case as one where

the public has been fully informed of the fact that the charged defendant had confessed to the crime, and that he had been previously tried and convicted of both rape and murder, and where on retrial the confession is suppressed but the public remains very much aware of the circumstances surrounding the case and has

---

18. Brief for Petitioner at 25–34. Petitioner also assigned error to the denial of the challenges for cause he made to Juror No. 3, Juror No. 12, and four potential jurors. App. at 16a; Brief for Petitioner at 34–39. The district court found no constitutional infirmity. 537 F.Supp. at 882–83. Petitioner does not raise those challenges on appeal.

Petitioner does argue on appeal that the trial court erred in denying his challenges for cause to Juror Hrin and both alternate jurors. Appellant's Brief at 25. Our disposition of this appeal makes it unnecessary to consider whether those arguments are properly before us.

formed definite opinions as to the guilt or innocence of the defendant.

*Id.* The magistrate calculated that over 70 percent of the veniremen and several of the jurors had testified that they had a fixed opinion, and stated that "a certain pall is cast upon those in the minority who testified that they had not formed a fixed opinion and could judge the case on its merits." *Id.* at 140a–41a. In his view, the empanelled jury was incapable of deciding the case solely on the evidence before it "but rather at best required the petitioner to prove his innocence or at least overcome strong preconceived notions as to his guilt." *Id.* at 141a. The magistrate concluded that petitioner could not have received a fair trial by an impartial jury in Clearfield County.

The district court rejected the recommendation of the magistrate. Although the court recognized the community's "substantial knowledge" of the case, it decided after an independent review of the record that the publicity had not been vicious or excessive. 537 F.Supp. at 877. It noted that the trial court had granted extensive latitude in the voir dire and stated that the exhaustion of the first panel of veniremen was not remarkable. *Id.* at 877, 882. The district court in its independent review also determined that all the jurors at some point said they could set aside their opinions. *Id.* at 877–82. Throughout it emphasized that the factual findings of the state court judge were presumptively correct under 28 U.S.C. § 2254(d) (1976). The district court concluded that petitioner had failed to carry his burden of establishing that actual prejudice had rendered a fair trial impossible.

C. *Discussion*

■ Petitioner argues on appeal that the exposure of the venire to prejudicial pretrial publicity, and the refusal to grant a

change of venue, violated his sixth amendment rights.[19] The sixth amendment guarantees to the accused the right to be tried "by an impartial jury." U.S. Const. amend. VI. Under the due process clause of the fourteenth amendment, the states are required to effectuate that right by giving "a fair trial to the accused by a panel of impartial, 'indifferent' jurors," *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *accord Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982); *see Sheppard v. Maxwell,* 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966).

■ To satisfy that constitutional standard the jurors need not be totally ignorant of the facts of a case. *Murphy,* 421 U.S. at 799–800, 95 S.Ct. at 2035–2036. A juror who has read about the case, even one who has conceived some notion as to the guilt or innocence of the accused, may nonetheless serve "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 799, 95 S.Ct. at 2035 (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643); *see Martin v. Warden,* 653 F.2d 799, 804, 806 (3d Cir. 1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982). At the same time, a juror's assurance that he can enter the jury box without an opinion is not dispositive if the accused can demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Murphy,* 421 U.S. at 800, 95 S.Ct. at 2036 (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643); *see United States v. Provenzano,* 620 F.2d 985, 995 (3d Cir.),

19. Petitioner in his brief separates his challenge based on pretrial publicity from his challenge based on the refusal to change venue. We consider the arguments to be inseparable. *See Martin v. Warden,* 653 F.2d 799, 802–06 (3d Cir.1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982). The pretrial publicity and its effects were the basis for petitioner's motions for a change of venue. Our inquiry in this habeas corpus proceeding is restricted to whether the refusal to change venue amounted to a violation of petitioner's constitutional rights. *Id.* at 804; *see Rideau v. Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). There could be no constitutional violation unless petitioner was denied his constitutional right to an impartial jury because of pretrial publicity. *Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962).

*cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

■■■ The petitioner challenging his state court conviction in a habeas corpus proceeding must shoulder a particularly heavy burden. Unlike a defendant seeking review of his federal conviction, the petitioner cannot argue that simply because his jury has read of extra-record facts with a high potential for prejudice, a federal court must presume that the jury was prejudiced. *Cf. Marshall v. United States,* 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curiam) (federal conviction reversed under supervisory power). A federal court reviewing a state conviction on habeas corpus may presume prejudice only in extraordinary cases where "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." *Murphy,* 421 U.S. at 798–99, 95 S.Ct. at 2035–2036; *see, e.g., Sheppard,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (extremely inflammatory publicity and a courthouse given over to carnival); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (trial in circus atmosphere); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (twenty-minute confession repeatedly broadcast on television). The publicity in this case, though it had a high potential for prejudice, did not utterly corrupt the trial atmosphere in that fashion. *See Murphy,* 421 U.S. at 798, 95 S.Ct. at 2035; *Martin,* 653 F.2d at 805. Petitioner must therefore show "that the publicity has been so extreme as to cause *actual prejudice* to a degree rendering a fair trial impossible." *Martin,* 653 F.2d at 805 (emphasis added); *See Murphy,* 421 U.S. at 797–799, 95 S.Ct. at 2034–2036; *Estes,* 381 U.S. at 542–44, 85 S.Ct. at 1632–1634; *Martin,* 653 F.2d at

804–06; *United States ex rel. Greene v. New Jersey,* 519 F.2d 1356, 1357 (3d Cir. 1975) (per curiam).[20]

To determine whether actual prejudice has been shown, we must examine the "totality of circumstances" for any indication that petitioner's trial was not fundamentally fair. *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); *see Sheppard,* 384 U.S. at 352, 86 S.Ct. at 1517. In *Irvin v. Dowd,* 366 U.S. 712, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court established the method by which such examinations are conducted. *See, e.g., Murphy,* 421 U.S. at 800–03, 95 S.Ct. at 2036–2038; *Beck v. Washington,* 369 U.S. 541, 556–57, 82 S.Ct. 955, 963–964, 8 L.Ed.2d 98 (1962); *see also Dobbert,* 432 U.S. at 302–03, 97 S.Ct. at 2302–2303. First, the Court in *Irvin* considered the extent and content of the publicity because it was indicative of "the then current community pattern of thought." *Irvin,* 366 U.S. at 725–27, 81 S.Ct. at 1644–1645. The Court then reviewed the voir dire. In the opinions expressed by potential jurors and the difficulty encountered in finding veniremen who could at least claim impartiality, the Court discovered evidence of a pattern of prejudice in the community. *Id.* at 727, 81 S.Ct. at 1645. Finally the Court looked to see whether that pattern of prejudice was reflected in the testimony of the jurors ultimately seated in the jury box. *Id.* at 727–28, 81 S.Ct. at 1645–1646. Considering all these factors, the Court then concluded that the jurors' assurances of impartiality had to be discounted. *Id.,* 366 U.S. at 728, 81 S.Ct. at 1645.

1. The Publicity

The publicity preceding petitioner's trial was extensive and had great potential for prejudice. As in *Irvin,* petitioner's case was

**20.** In addition, because petitioner is challenging a state conviction on a petition for a writ of habeas corpus, the factual findings of the state courts are presumed to be correct unless petitioner can establish by convincing evidence that the factual findings were erroneous. 28 U.S.C. § 2254(d) (1976); *see Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). At the same time, we have a duty as a federal appellate court "to make an independent evaluation of the circumstances." *Shep-* pard, 384 U.S. at 362, 86 S.Ct. at 1522. In particular, because the nature and strength of a venireman's opinion is a mixed question of law and fact, *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643, we must "independently evaluate the voir dire testimony of the impaneled jurors" and the potential jurors. *Id.; Martin,* 653 F.2d at 807; *see Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–1715, 64 L.Ed.2d 333 (1980).

a "*cause celebre*" in a rural community which had been subjected to a barrage of publicity concerning a sensational murder. *Irvin,* 366 U.S. at 725, 81 S.Ct. at 1644; *see Murphy,* 421 U.S. at 798, 95 S.Ct. at 2035. That publicity, although accurate, factual in nature, and without editorial comment, *see Murphy,* 421 U.S. at 800 n. 4, 802, 95 S.Ct. at 2036, n. 4, 2037; *Beck,* 369 U.S. at 556, 82 S.Ct. at 963; revealed prejudicial information "never heard from the witness stand" in the second trial. *See Sheppard,* 384 U.S. at 356, 86 S.Ct. at 1519.

First, the publicity disclosed that the jury in the first trial had convicted petitioner of the murder. Few revelations could be so damning to an accused. *United States v. Williams,* 568 F.2d 464, 471 (5th Cir.1978). Possibly even more prejudicial was the disclosure of petitioner's written confessions and his testimony at the first trial. *See Rideau,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; *United States v. Haldeman,* 559 F.2d 31, 61 (D.C.Cir.1976) (in banc) (per curiam), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *see also United States ex rel. Doggett v. Yeager,* 472 F.2d 229, 231 (3d Cir.1973). The confessions and testimony detailed in a highly unfavorable light petitioner's actions and thoughts at the time of the homicide. They were sworn revelations of information which petitioner's properly admitted oral statements simply did not convey. *Cf. Stroble v. California,* 343 U.S. 181, 195, 72 S.Ct. 599, 606, 96 L.Ed. 872 (1952) (confession printed in newspaper was introduced into evidence); *see also United States v. D'Andrea,* 495 F.2d 1170, 1172–73 (3d Cir.) (per curiam), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974). Finally, the publicity revealed that petitioner at the first trial had pled temporary insanity and had been convicted of rape. Such highly inflammatory facts carried too great a risk of prejudice to be directly offered as evidence. *See Marshall,* 360 U.S. at 312–13, 79 S.Ct. at 1172–1173; *United States ex rel. Greene v. New Jersey,* 519 F.2d 1356 (3d Cir.1975) (per curiam). "The exclusion of such evidence in court is meaningless when the news media makes it available to the public." *Sheppard,* 384 U.S. at 360, 86 S.Ct. at 1521; *see Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037.

The publicity was understandably most extensive and most potentially prejudicial before and during petitioner's first trial, which was four years before his second trial. The passage of time may work to erase highly unfavorable publicity from the memory of a community. *See, e.g., Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037; *Beck,* 369 U.S. at 556, 82 S.Ct. at 963. In this case, however, voir dire revealed that more than 98 percent of the veniremen questioned remembered the case. In part this was due to the repeated community exposure provided by newspaper coverage of the appeal and retrial[21] which helped keep fresh the imprint of the case in the minds of the public.[22] More important, the publicity attending the homicide and first trial

---

21. The state trial court, though the record contained at least 17 front-page articles, said that between trial and retrial "there was practically no publicity given to this matter through the news media . . . ,except to report that a new trial had been granted by the Supreme Court." App. at 751a. We believe, however, that petitioner has established by convincing evidence that the state court's characterization of the coverage was erroneous. 28 U.S.C. § 2254(d) (1976). The record on this petition indicates that 66 front-page articles were published covering the appeal and second trial. *Cf. Sumner v. Mata,* 449 U.S. at 547, 101 S.Ct. at 769 (federal and state court had identical record). We agree with the magistrate who after two days of evidentiary hearings found that the second trial "was surrounded with publicity, but not to the same degree" as the first trial. App. at 136a.

22. The trial court stated that "as far as this Court can recall" there was little talk in public concerning the second trial. App. at 196a. Veniremen during voir dire indicated, however, that there had been public discussion of the case, particularly in last weeks before retrial. Such discussion apparently did not reach the attention of the trial court.

The trial court also noted that few spectators had attended trial on some days, particularly during voir dire. Because petitioner alleges prejudice not from a "circus atmosphere" in the courtroom, *see Murphy,* 421 U.S. at 798, 95 S.Ct. at 2035; *Martin,* 653 F.2d at 805, but from public knowledge of extra-record facts, occasional low attendance is a factor of limited significance.

had been so extensive and intensive that the case was firmly implanted in the memories of Clearfield County residents.

■■■ Petitioner has established that the publicity before his second trial had revealed prejudicial information from his first trial, information which was not officially in evidence against him. The widespread dissemination of such extra-record information, while not rendering the jury presumptively prejudiced, poisoned the "general atmosphere of the community" in which petitioner was retried. *See Murphy*, 421 U.S. at 802, 95 S.Ct. at 2037. If petitioner can show that that atmosphere caused actual prejudice in the jurors, their assurances of impartiality can be disregarded. *Id.*

2. The Voir Dire

The difficulty of voir dire may provide crucial evidence that the sentiments of the community were so poisoned against an accused as to impeach the asserted indifference of his jurors. *Murphy*, 421 U.S. at 803, 95 S.Ct. at 2037. "The length to which the trial court must go in order to select jurors who appear to be impartial" reveals a great deal about those jurors' assurances of impartiality:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Id.* at 802–03, 95 S.Ct. at 2037–2038.

In this case, as in *Irvin*, "impartial jurors were hard to find." *Irvin*, 366 U.S. at 727, 81 S.Ct. at 1645. In the long and difficult voir dire [23] 163 veniremen were questioned on the case. Our independent examination of the voir dire testimony shows that 126 prospective jurors, or 77 percent of the 163 veniremen questioned, admitted that they would carry an opinion into the jury box. The trial court itself excused on challenges for cause 117 of those veniremen, or 72 percent of the 163, after they stated that they could not set aside their opinion.[24] Only when petitioner had exhausted his peremptory challenges could enough jurors be found to fill the jury box. *Cf. Dobbert*, 432 U.S. at 302, 97 S.Ct. at 2302–03 (peremptory challenges not exhausted); *United States v. Gorel*, 622 F.2d 100, 103–04 (5th Cir.) (same), *cert. denied*, 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980).

In *Irvin* the trial court dismissed for cause 268 of 430 veniremen, or 62 percent, because they had fixed opinions concerning the petitioner's guilt. Almost 90 percent of those examined entertained some opinion as to guilt. 366 U.S. at 727, 81 S.Ct. at 1645. In those circumstances the Supreme Court "readily found actual prejudice against the petitioner to a degree that rendered a fair trial impossible." *Murphy*, 421 U.S. at 798, 95 S.Ct. at 2035; *accord United States ex rel. Bloeth v. Denno*, 313 F.2d 364, 368–69 (2d Cir.1962) (in banc) (31 of 38 veniremen questioned had formed opinion), *cert. denied*, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963). By contrast, in *Murphy* the Court found no basis to cast doubt on the juror's assurances of impartiality where only 20 of 78 veniremen questioned, or 26 percent, were excused because they disclosed an opinion as to guilt. *Id.* at 803, 95 S.Ct. at 2037; *accord Beck*, 369 U.S. at 556, 82 S.Ct. at 963 (14 of 56 veniremen might have had opinions); *Martin*, 653 F.2d at 806 (23 of 81 veniremen questioned had opinions); *Brinlee v. Crisp*, 608 F.2d 839, 845 (10th Cir.1979) (19 of 47 veniremen ques-

---

**23.** The trial court explained that the voir dire was lengthy because petitioner was permitted to ask so many questions. App. at 194a–95a, 751a. The court did indeed extend great leniency to petitioner in his questioning of the veniremen. Such leniency was commendable. It was also necessary under the circumstances, and does not explain away the difficulty of the voir dire as a real factor in our consideration.

**24.** The trial court stated that the difficulty in selecting a jury was due in part to his leniency in granting challenges for cause. App.at 195a, 751a. In our independent evaluation, each of the 117 veniremen dismissed for cause by the trial court had expressed a disqualifying prejudice which required dismissal. In fact, as we have noted, the trial court refused to dismiss several veniremen who had expressed a disqualifying prejudice, and permitted some of them to sit as jurors.

tioned had opinions), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980); *Haldeman,* 559 F.2d at 70 & n. 56 (29–36 percent of veniremen arguably had opinions), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Mastrian v. McManus,* 554 F.2d 813, 818 (8th Cir.) (41 of 92 veniremen questioned had opinions), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977).

In the instant case voir dire revealed other indications of a deep and bitter prejudice present in the community. One venireman apparently veiled his strong feelings when testifying. Another said that her fellow parishioners tried to influence her to vote guilty. Many veniremen volunteered opinions of guilt, and over 90 percent of those asked said they had discussed the case or heard others express their opinions.

We believe that the voir dire in this case more strongly resembles that of *Irvin* than that of *Murphy. See Martin,* 653 F.2d at 806. Three-quarters of the veniremen admitted to an opinion of guilt which they could not set aside. "Where so many, so many times, admitted prejudice, [a juror's] statement of impartiality can be given little weight." *Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645; *Martin,* 653 F.2d at 806.

3. The Jurors Selected

▉▉▉▉ The prejudice permeating the voir dire and the community was reflected in the voir dire testimony of the majority of the twelve jurors and two alternates ultimately placed in the jury box.[25] All but one of the jurors were familiar with the case, and several explicitly recalled petitioner's conviction or confessions. Eight out of fourteen jurors would admit that, before hearing any testimony, they had formed an opinion as to petitioner's guilt or innocence. *Cf. Irvin,* 366 U.S. at 727, 81 S.Ct. at 1645 (8 of 12 had formed opinions); *Denno,* 313 F.2d at 367–68 (8 of 16 had formed opinions).[26]

> With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man.

*Irvin,* 366 U.S. at 727, 81 S.Ct. at 1645 (citation omitted). Indeed, when asked whether they could set their opinions aside and forget what they had heard, many of the jurors gave uncertain and ambiguous answers. Even such equivocal assurances of impartiality were preferable to the open admissions of prejudice made by Juror Hrin and the two alternates, who went "so far as to say that it would take evidence to overcome their belief." *Id.* at 728, 81 S.Ct. at 1645; *Murphy,* 421 U.S. at 798,[27] 95 S.Ct. at 2035.

**25.** The alternate jurors were dismissed and did not participate in the jury's deliberations. An alternate who did not deliberate does not contaminate a jury unless there is reason to believe that the jury had been exposed to the alternate's prejudicial information or opinion. *See United States v. Vento,* 533 F.2d 838, 860–70 (3d Cir.1976). In this case the jurors were told they could discuss the case among themselves when sequestered. For four days the two alternate jurors were seated and sequestered with the regular jurors. Even though there is no evidence that the prejudiced alternates talked to the regular jurors, such a sustained condition of "continuous and intimate association" operates to subvert the requirement that the jury's verdict be based on evidence developed from the witness stand. *See Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–550, 13 L.Ed.2d 424 (1965) (jurors guarded by deputy sheriffs who were witnesses); *see also United States ex rel. Owen v. McMann,* 435

F.2d 813 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971).

**26.** As a result of our independent evaluation, we must therefore reject the trial court's conclusion that "almost all, if not all, [of the first twelve] jurors ... had no prior or present fixed opinions." App. at 196a.

**27.** Petitioner did not challenge nine jurors. Because Pennsylvania at the time of retrial required that objection be made before the jury retired to deliberate, Pa.R.Crim.P. 1106(d) (1975), petitioner's failure to challenge a juror for cause waived objection to that particular juror, *Provenzano,* 620 F.2d at 996 n. 15, unless petitioner can show cause for failing to object and prejudice therefrom. *Rogers v. McMullen,* 673 F.2d 1185, 1188 (11th Cir.1982); *Graham v. Mabry,* 645 F.2d 603, 606 (8th Cir.1981); *see Engle v. Isaac,* 456 U.S. 107, 130, 102 S.Ct. 1558, 1568, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d

It is hardly surprising that the assurances of impartiality given by petitioner's jurors were equivocal or negative. It is more surprising that some could indeed give blanket assurances of impartiality. Petitioner's jurors were members of a community barraged by publicity and alive with discussion, a community where three quarters of those called would admit to a disqualifying prejudice. Those jurors were then asked to forget that petitioner had been convicted of the murder, and rape, of Pamela Rimer. They were asked to forget how petitioner twice in writing and once on the stand had retold in detail that he had killed her, and how he had offered no defense except for temporary insanity. Those jurors were asked to forget all they knew and put their impressions and opinions aside. Such a request took insufficient account of "the frailties of human nature." *Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645.

"Impartiality is not a technical conception. It is a state of mind." *Id.* at 724, 81 S.Ct. at 1643 (quoting *United States v. Wood,* 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936)). We must view the jurors' assurances of impartiality in light of the pretrial publicity, the difficulty of voir dire, and the testimony of the jurors selected. We conclude that despite their assurances of impartiality, the jurors could not set aside their opinions and render a verdict based solely on the evidence presented in court. Petitioner has shown that the pretrial publicity caused actual prejudice to a degree rendering a fair trial impossible in Clearfield County. After examining the totality of circumstances, we hold that petitioner's retrial was not fundamentally fair.

### III. CONCLUSION

We will affirm that part of the district court's order holding that petitioner's constitutional right against self-incrimination was not violated by the admission into evidence of his oral statements. We will vacate that part of its order holding that retrial in Clearfield County did not infringe

594 (1977). Where as here a fair trial was impossible not because of a particular juror but regardless of the particular jurors, challenge of any individual juror for cause is not required.

petitioner's right to a fair trial by an impartial jury.

Petitioner's detention and sentence of life imprisonment are in violation of the Constitution of the United States. He is therefore entitled to be freed from that detention and sentence. Petitioner is still subject to custody under the indictment, however, and he may be retried on this or another indictment. *Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645.

We will remand the case to the district court with the direction that a writ of habeas corpus shall issue unless within a reasonable time the Commonwealth shall afford petitioner a new trial.

STERN, District Judge, concurring.

Under any test reflecting even the most minimal respect for the values embodied in the sixth amendment, we would be compelled to invalidate this conviction. My concern, however, is with the particular constitutional standard which for 175 years has guided the lower courts, which we are obligated to apply today, and which renders constitutional trials taking place under circumstances only slightly less shocking than those presented in this case.

In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court, crystalizing earlier language from *United States v. Burr,* 25 F.Cas. 49, 50–51 (C.C.D.Va.1807) (No. 14,692g) (Marshall, C.J.); *Reynolds v. United States,* 98 U.S. 145, 155–156, 25 L.Ed. 244 (1878); *Spies v. Illinois,* 123 U.S. 131, 179–80, 8 S.Ct. 21, 30–31, 31 L.Ed. 80 (1887), and *Holt v. United States,* 218 U.S. 245, 248, 31 S.Ct. 2, 4, 54 L.Ed. 1021 (1910), established that it is permissible to empanel a jury composed of 12 persons, all of whom have a preconceived opinion that the defendant is guilty, as long as each promises to "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643. *Accord Murphy v. Florida,* 421 U.S. 794, 95 S.Ct.

Failure to challenge any of the jurors selected, however, is "strong evidence" that the accused thought the jurors were not biased. *Beck,* 369 U.S. at 557–58, 82 S.Ct. at 964.

2031, 44 L.Ed.2d 589 (1975); *Martin v. Warden,* 653 F.2d 799 (3d Cir.1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982).

According to the *Irvin* Court: "[T]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643. I cannot see why it is "impossible" to obtain jurors who do not begin with a bias. The test I suggest would not disqualify a juror merely because he has been exposed to pretrial publicity; rather, only those who represent that they have formed an opinion—irrespective of the degree of its fixation—must be excluded automatically from jury participation.

There can be but two possible explanations for the *Irvin* standard. The first is that it presumes to be meaningful: that a promise to lay aside an opinion, for example, that an accused high school teacher brutally killed one of his own students is either believable or enforceable. Definitive refutation of this precept as a psychological matter is, of course, beyond my capabilities, but I would venture that no one of us would want to gamble our freedom on the ability of a person to erase a preformed opinion as to guilt.[1] Moreover, even if such self-imposed amnesia is possible as a cognitive event, surely its prediction is not reliable—that is, we cannot expect a person to know with any degree of accuracy at the time of voir dire whether or not he will be able to lay aside an opinion, however desirous he is of achieving that end. I see no reason to subject our jury system to the hazards of guesswork, particularly where the alternative is so easily achieved. Thus, I reject the *Irvin* standard as a means to insure impartial jurors.[2]

1. Commentators with psychological training have come to the same conclusion. *See, e.g.,* Comment, Fair Trial v. Free Press: The Psychological Effect of Pre-Trial Publicity on the Juror's Ability to be Impartial; A Plea for Reform, 38 S.Cal.L.Rev. 672, 682 & nn. 53, 54 (1965); *see also* Stanga, Jr., Judicial Protection of the Criminal Defendant Against Adverse Press Coverage, 13 Wm. & Mary L.Rev. 1, 5 & n. 23 (1971).

2. The voir dire at the celebrated trial of "Boss" Tweed over 100 years ago provides a wonderful example of the strain imposed upon any notion of "impartiality" by the "laying aside" standard. Various veniremen, all of whom indicated a preformed opinion of some degree, revealed a variety of strategies by which they felt they could rid themselves of their initial partiality. In listening to their voices, we must decide if it makes sense to continue the same dialogues today.

One venireman suggests that he is able to lay aside his opinion as a matter of duty:

Q. If you were to go into that jury box, would you require any evidence whatever to remove the impression that you now have?
A. Not as a juryman; no, sir.
Q. Your belief as a juryman is a different thing from your belief as a man?
A. If any one should come up in the street and tell me Mr. Tweed was an innocent man, I should not at once believe it unless he gave me some proof to the contrary; but in the jury-box I go in there free from any prejudice as a juryman. I think that is the duty of the juryman, that it ought not to require any

evidence at all to remove any impression. That is what I intended to convey in my answer to the judge.

Record of *People v. Tweed,* 50 How.Pr. 262 (N.Y.Sup.Ct.1876) at 104. Another admits that the process is unpredictable:

Q. If you were to go into the trial as a juror would you not carry that same [preformed] impression into the jury-box?
A. I think if I was called upon to serve as a juror I could free my mind from all prejudice or impressions and act impartially; that is my belief.
Q. Have you ever tested that belief in a like case?
A. Never, sir.
Q. It would be an experiment on your part?
A. Certainly it would

*Id.* at 142–43. Another views the process as one of degrees of belief:

The Court—I would like to have you give in your own way and in your own language the condition of your mind in regard to Mr. Tweed or his dealings with the city.

The Witness—My view is this: I read the newspaper like everybody else; I have heard the proceedings, and of the charges against Mr. Tweed like everybody else, I have certain superficial information; on that superficial information I have formed an opinion; that is all I have had to do, and all I have seen the necessity of doing; I have never looked into the case with any degree of particularity; I have never examined the evidence as a lawyer would have examined it. I have formed an opinion; I do not consider that I have formed what I call a decided opinion, because

The second conceivable rationale for the *Irvin* test is that it is a practical necessity, without which the empanelling of juries would be impossible. I simply refuse to believe that in a land as populous as ours, where potential jurors abound, the only way to assemble a group of 12 impartial persons is to allow those with advance opinions to sit as long as they give a proper incantation of their ability to lay aside those opinions. If a jury cannot be selected without resort to persons with preformed views of a defendant's guilt, it should be a simple matter to transfer the case to another county. There is simply no societal interest advanced by seating a juror who has openly stated that he has a view concerning the defendant's guilt, notwithstanding that it can be "laid aside."

The vulnerability of the *Irvin* "laying aside" standard is only heightened where attempts to temper its potentially devastating consequences for a criminal defendant are examined. The *Murphy* Court pointed out that,

> [T]he juror's assurances that he is equal to this task [laying aside prior opinion] cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality."

*Murphy,* 421 U.S. at 800, 95 S.Ct. at 2036 (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643). I am at a loss to understand how a defendant would ever be able to demonstrate that despite a venireman's assurance that he is able to lay aside a preconception of defendant's guilt, there actually exists in the potential juror's mind a "fixed" opinion which cannot be extinguished.

My view of the proper standard by which to measure the propriety of seating a particular juror does away with the distinction between opinions that are "fixed" and those that are something less so, as a spectral analysis empty of meaning. A person with any opinion going to the issue of a defendant's guilt is simply unfit to serve on a jury. It is incredible to me that anyone would want to take the contrary view. Further, in a highly publicized case, I would discredit the denial of preconceived opinions where a significant percentage of those polled state that they hold opinions concerning the defendant. While the Court has recognized that veniremen prejudice may be presumed in the face of protestations to the contrary where most of the other prospective jurors admit to a disqualifying bias, *compare Irvin,* 366 U.S. at 727, 81 S.Ct. at 1645 (nearly 90 percent of veniremen have some opinion regarding defendant's guilt; prejudice in remainder presumed), *with Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037 (roughly 26 percent of veniremen have an opinion; no presumption regarding remainder), I would not allow any jury to be empanelled where more than 25 percent of the veniremen state that they hold an opinion concerning the defendant's guilt. Where over one quarter of those polled indicate such bias, I have grave doubts as to the sincerity of

I have not looked into it so thoroughly as to entitle me to have that opinion, but I have given it this general superficial examination. I am now here and am called upon this struck jury, and if I am to serve as juryman, I believe that I can act conscientiously and fairly for Tweed and fairly for the County. I have been asked the question whether I would prefer that Tweed should succeed or the County, and I have answered that I should prefer that the County should succeed. I do not mean that I would have any bias which would make me decide against Tweed, for the County or against the County for Tweed; I would be prepared to decide according to the evidence. *Id.* at 94–95. Another describes the process as a function of will:

Q. But could you, no matter what form of oath were put to you, enter upon the trial without having the impression upon your mind that Mr. Tweed has been guilty of those frauds?
A. I should try.
Q. Could you succeed?
A. I think so.
Q. You think that you could forget what you now believe?
A. I think I could dismiss it from my mind; forget it, no.
*Id.* at 204.
All of these veniremen were seated as competent jurors.

representations of impartiality by others in the community.

It has long been the foundation of our legal system that, "[N]o man's life, liberty or property be forfeited as criminal punishment for violation of that law until there ha[s] been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Chambers v. Florida,* 309 U.S. 227, 236–37, 60 S.Ct. 472, 476–477, 84 L.Ed. 716 (1940). I do not see how we can live by this ideal while continuing to apply the *Irvin* test. I would adopt a different standard, originating at the confluence of sense and simplicity, which would prevent any person from entering the jury box and becoming a judge of the facts if he has any preconceived view of the merits of the case.

GARTH, Circuit Judge, concurring in the judgment.

In this case Juror James F. Hrin, who sat in judgment of the petitioner, Jon Yount, admitted during his *voir dire* that until he was shown facts establishing Yount's innocence, he would find it difficult to change his opinion about Yount's guilt. Because I conclude that Hrin, by so testifying during the *voir dire,* demonstrated "the actual existence of such an opinion in the mind of [one of Yount's] juror[s] as will raise the presumption of partiality," *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961), I concur in the judgment of the court that a new trial is required.

My concurrence, however, is limited to the issue raised by Yount's charge that Juror Hrin had been improperly impaneled. Thus, while I agree with Judge Hunter that Yount's fifth amendment rights were not violated when his inculpatory statements were admitted at his second trial, I do not

agree with Judge Hunter that pre-trial publicity required a change of venue. As I read the record, it was the failure of the trial judge to apply the principles of *Irvin, supra,* in excusing jurors for cause that resulted in an unfair trial. Thus, I restrict my vote for a remand and new trial solely to the issue of Juror Hrin's impaneling as a juror, and do not agree with Judge Hunter's thesis that the district court erred in denying a change of venue.

I.

As the majority notes, Yount had been convicted of murder and rape in 1966. After the Pennsylvania Supreme Court set aside both of these convictions in 1969, Yount was tried a second time for murder in November of 1970. The voir dire in this second trial exhausted ten days and 167 veniremen [1], 121 of whom were dismissed for cause.

Among the twelve jurors and two alternates selected to try Yount, six testified that they had formed no opinions as to Yount's guilt. Five jurors stated that they had formed opinions about the case, but that they could lay those opinions aside and keep an open mind. Finally, three jurors—both of the alternates and Juror James F. Hrin—testified that they had opinions of Yount's culpability but could change these opinions if the proper evidence were presented.[2]

Juror Hrin's voir dire examination by the prosecution disclosed that Hrin was uncertain whether he could render a verdict based solely on the evidence adduced at trial. Responding to two questions by the prosecutor, Hrin asserted that he "wouldn't say for sure" whether he could "erase or remove the opinion" he held, but stated a second time that he could do so. Hrin's answers were punctuated with suggestions

---

**1.** Two hundred ninety-two persons were selected as talesmen for Yount's second trial, 125 of whom the court dismissed as improperly chosen after learning that the Clearfield County sheriff had selected friends and acquaintances of his own in order to obtain a full complement of jurors. The court dismissed an additional four jurors for cause before questioning. Al-

though the Magistrate's report lists 168 jurors who were questioned, I agree with Judge Hunter that the record reveals only 167.

**2.** Neither alternate juror participated in the jury's deliberations. Their impartiality is not challenged before us.

that he thought he "possibly could" render a fair verdict, and that "[i]t would be rather difficult for me to answer" whether he "could enter the jury box presuming [Yount] to be innocent." [3]

Under cross examination by counsel for the defendant Yount, Hrin asserted that he would require the production of evidence before he would abandon any opinion of Yount's guilt. Hrin stated as follows:

Q. Did I understand Mr. Hrin you would require some—you would require evidence or something before you could change your opinion you now have?

A. Definitely. If the facts show a difference from what I had originally had been led to believe, I would definitely change my mind.

Q. But until you're shown those facts, you would not change your mind—is that your position?

A. Well—I have nothing else to go on.

Q. I understand. Then the answer is yes—you would not change your mind until you were presented facts?

A. Right, but I would enter it with an open mind.

Q. In other words, you're saying that while facts were presented you would keep an open mind and after that you would feel free to change your mind?

A. Definitely.

Q. But you would not change your mind until the facts were presented?

A. Right....

Yount promptly challenged Juror Hrin for cause, a challenge the trial court denied because "he declared he could go in there with an open mind." The trial court reasoned as follows:

I deny the challenge for cause because he declared he could go in there with an open mind; and Commonwealth against [*Commonwealth v.*] Bentley [287 Pa. 539, 135 A. 310 (1926)] sets forth that—any juror is incompetent who has a fixed and definite opinion which cannot be erased by hearing and evidence—and he said he could disregard it and be guided by the law and evidence, and I believe he stated he could go in with an open mind. I would accept that as being sufficient to overcome the conviction that you proposed that he has a fixed opinion that he could not put aside and I think his answers were unequivical [sic] enough as to any fixation as to opinion as he declared although he had a solid opinion it is not quite as solid as it used to be which indicates that it is not solid. His expression is such that there is not now a fixed opinion and therefore I so accept it.

On appeal, the Pennsylvania Supreme Court concluded summarily that "[t]he record shows that none of the jurors had a fixed opinion as to appellant's guilt or innocence, or was otherwise legally unable to serve." *Commonwealth v. Yount,* 455 Pa. 303, 314, 314 A.2d 242, 248 (1974).

**3.** Hrin's voir dire examination by the prosecutor was as follows:

Q. Have you formed any opinion as to the guilt or innocence of Mr. Yount?

A. To the degree that it was written up in the papers, yes.

Q. Is this a fixed opinion on your part?

A. This is sort of difficult to answer.

Q. Let me ask—if you were to be selected as a juror in this case and take the jury box, could you erase or remove the opinion you now hold and render a verdict based solely on the evidence and law produced at this trial?

A. It is very possible. I wouldn't say for sure.

Q. Do you think you could?

A. I think I possibly could.

Q. Then the opinion you hold is not necessarily a fixed and immobile opinion?

A. I would say not, because I work at a job where I have to change my mind constantly.

Q. Would you be able to change your mind regarding your opinion before you become a juror in this case? That's the way I must have you answer the question.

A. If the facts were so presented I definitely could change my mind.

Q. Would you say you could enter the jury box presuming him to be innocent?

A. It would be rather difficult for me to answer.

Q. Can you enter the jury box with an open mind prepared to find your verdict on the evidence as presented at trial and the law presented by the Judge?

A. That I could do.

On January 8, 1981, Yount filed *pro se* a petition for habeas corpus. Paragraph 12–B of the petition asserted in part that "two [jurors] stated that they would require Petitioner to prove his innocence." In light of the record in this case, it is patent that one of the jurors referred to in paragraph 12–B is Juror Hrin.[4] The district court reviewed pertinent portions of each of the jurors' voir dire testimony, including Hrin's, but did not concentrate on Hrin's testimony in particular, and made no findings respecting it. *See Yount v. Patton,* 537 F.Supp. 873, 880 (W.D.Pa.1982). Yount argues before us on appeal that Hrin had abandoned the presumption of innocence, and that Yount could not constitutionally be convicted by a panel containing such a juror.

## II.

As the Supreme Court in *Nebraska Press Association v. Stuart* stated, "pretrial publicity—even pervasive, adverse publicity— does not inevitably lead to an unfair trial." 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976). In order to explain fully why I do not believe the district court erred in denying a change in venue due to alleged prejudicial publicity, it is useful to review those circumstances in which jury exposure to adverse publicity does require a new trial.

First, the accused may demonstrate the actual existence of prejudice attributable to pretrial publicity on the part of one or more members of the jury. *See Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Such prejudice must be shown "not as a matter of speculation but as a demonstrable reality," *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956), and is usually established by reliance on the jurors' *voir dire* responses. *See United States v. Chagra,* 669 F.2d 241, 250 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).

Second, in extreme cases of highly inflammatory pretrial publicity which saturates the community from which the jury is drawn, the accused may rely on a presumption of partiality, and need not prove actual bias. *See Rideau v. Louisiana,* 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963); cf. *Murphy v. Florida,* 421 U.S. 794, 802–03, 95 S.Ct. 2031, 2037–2038, 44 L.Ed.2d 589 (1975); *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). This presumption is rebuttable, however, and the prosecution may demonstrate the impartiality of the jury by reliance on the *voir dire* testimony. *See United States v. Chagra, supra,* 669 F.2d at 250, 252–54; *United States v. Johnson,* 584 F.2d 148, 154 (6th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979); *United States v. Gullion,* 575 F.2d 26, 29–30 (1st Cir.1978).

Third, the accused can demonstrate "a significant possibility of prejudice," *United States v. Davis,* 583 F.2d 190, 196 (5th Cir. 1978), and that the *voir dire* procedure was inadequate to permit its discovery. *See United States v. Blanton,* 700 F.2d 298, 307–08 (6th Cir.1983); *United States v. Dellinger,* 472 F.2d 340, 374–75 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *Silverthorne v. United States,* 400 F.2d 627, 639 (9th Cir.1968); cf. *United States v. Capo,* 595 F.2d 1086, 1092 n. 6 (5th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); *United States v. Haldeman,* 559 F.2d 31, 64–71 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Addonizio,* 451 F.2d 49, 65–67 (3d Cir.1971), *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972).

In addition, in two classes of cases the accused may assert that events transpiring during the course of trial rendered the trial unfair. *In Sheppard v. Maxwell,* 384 U.S.

---

**4.** There is therefore no question that the issue of Hrin's partiality is before us on appeal. *See United States ex rel. Hickey v. Jeffes,* 571 F.2d 762, 766 (3d Cir.1978) ("[w]e can consider any issue, previously considered by the Pennsylvania courts, which was presented to the district court and would be ground for a reversal"). I assume that the other juror referred to in paragraph 12–B was an alternate juror. No alternates were substituted for members of the jury which convicted Yount. *See* note 2 *supra.*

333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the Supreme Court condemned the conduct of trials "utterly corrupted by press coverage." *See Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1975). In these cases, the presence of the press during trial rendered the conduct of a fair trial impossible.[5] A similar intrusion into the trial process occurs when members of the jury are exposed to publicity *during* the trial. *See Marshall v. United States,* 360 U.S. 310, 311, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959); *Goins v. McKeen,* 605 F.2d 947, 952–54 (6th Cir.1979); *United States v. Williams,* 568 F.2d 464, 468 (5th Cir.1978); *United States v. Jones,* 542 F.2d 186, 194–97 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976).

In this case, no juror was exposed to adverse publicity during trial, and the record reflecting the publicity preceding Yount's second trial, in my opinion, was not so inflammatory as to give rise to a presumption of partiality. In addition, it is conceded that the trial court "extend[ed] great leniency to [Yount] in his questioning of the veniremen," Maj. op., at 970 n. 23, and no argument is raised that the *voir dire* was less than ample to expose the prejudices of potential jurors. Therefore, the only basis for upsetting Yount's conviction is the existence of the "actual prejudice" of one or more members of the jury.

An accused may demonstrate "actual prejudice" on the part of the jury in two ways. First, the defendant may establish, by means of the *voir dire* testimony, that one or more jurors had a preconceived opinion of the defendant's guilt which could not be set aside in order to "render a verdict based on the evidence presented in court." *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643. In such a case, the trial court

would err by not granting a challenge to this juror for cause. A change of venue, however, would not be required if the challenge for cause were granted.

Second, in extremely rare circumstances the accused may establish "actual prejudice" by inference. *See Murphy v. Florida,* 421 U.S. 794, 803, 95 S.Ct. 2031, 2038, 44 L.Ed.2d 589 (1975). In such a case the defendant must demonstrate "a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* In the only Supreme Court case to rely on this ground, *Irvin v. Dowd,* ninety percent of those examined on the point had a preconceived notion of the defendant's guilt, and eight persons who actually sat in judgment of the defendant thought the defendant guilty. 366 U.S. at 727, 81 S.Ct. at 1645. Indeed, just recently this court refused to apply the *Irvin* principle to reverse a conviction in which only 23 of 71 persons known to be exposed to pretrial publicity had fixed opinions of the defendant's guilt. *Martin v. Warden,* 653 F.2d 799, 806 (3d Cir.1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982). Thus while I agree that if the defendant establishes the existence of a community "so poisoned against the [defendant] as to impeach the indifference of jurors who displayed no animus," then a change of venue is required, I do not agree that merely because a number of prospective jurors harbor opinions of guilt, that the *voir dire,* fairly conducted, cannot screen the biased from the fair-minded.

A showing of actual prejudice by this method is not to be lightly accomplished. As the Fifth Circuit stated in *United States v. Dozier,* 672 F.2d 531, 546 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982), "detection of actual

---

**5.** Although *Rideau v. Louisiana, Sheppard v. Maxwell,* and *Estes v. Texas* are frequently discussed as a unit, *see, e.g., United States v. Dozier,* 672 F.2d 531, 545–46 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982), *Sheppard* and *Estes* should be recognized as analytically distinct from *Rideau.* *Rideau* represents the only instance in which the Supreme Court has reversed a conviction

solely on the basis of the extent and nature of pretrial publicity without a showing of actual prejudice. *See Mayola v. Alabama, supra,* 623 F.2d at 997. *Sheppard* and *Estes,* in contrast, represented intrusions into the trial process which undermined the integrity of the trial. *See United States v. Chagra, supra,* 669 F.2d at 249 n. 10; *United States v. Haldeman, supra,* 559 F.2d at 61 n. 32.

prejudice is not accomplished through juggling statistics." *Irvin* does not establish a bright-line rule that a venire containing a percentage of biased talesmen above a certain level is presumptively bad. Rather, the court must examine the totality of the circumstances, including the adequacy of the *voir dire* in ferreting out biased jurors, in order to establish whether a change of venue is constitutionally required.

A thorough and skillfully conducted *voir dire* should be adequate to identify juror bias, even in a community saturated with publicity adverse to the defendant. As the District of Columbia Court of Appeals noted, "voir dire has long been recognized as an effective method of rooting out such bias, especially when conducted in a careful and thoroughgoing manner." *In re Application of National Broadcasting Co.,* 653 F.2d 609, 617 (D.C.Cir.1981) (footnotes omitted). For this reason the courts of appeals have repeatedly expressed "confidence in the effectiveness of a skillful voir dire to counteract the threat of pretrial publicity." *United States v. Duncan,* 598 F.2d 839, 865–66 (4th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). Reviewing the conviction of Lieutenant William Calley for the killing of civilians at My Lai, a trial that generated considerably more pretrial publicity than Yount's second trial in 1970, the Fifth Circuit observed that "[t]here has been a greater willingness to uphold a trial court's determination that jurors were capable of rendering an impartial verdict where that conclusion was reached after deliberate, searching, and thorough *voir dire.*" *Calley v. Callaway,* 519 F.2d 184, 209 n. 45 (5th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). *See also Graham v. Mabry,* 645 F.2d 603, 611 (8th Cir.1981); *United States v. Capo,* 595 F.2d 1086, 1091–92 (5th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); *Margoles v. United States,* 407 U.S. 727, 729–31 (7th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969).

As *Irvin* makes plain, a juror's subjective affirmation of impartiality is not dispositive of the question of juror bias. It has always been clear that "merely going through the form of obtaining jurors' assurances of impartiality is insufficient." *United States ex rel. Bloeth v. Denno,* 313 F.2d 364, 372 (2d Cir.), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963). Instead, the trial court must determine independently and objectively whether the jurors' assurances are credible. *See United States v. Blanton,* 700 F.2d 298, 307–08 (6th Cir. 1983); *United States v. Gerald,* 624 F.2d 1291, 1296–97 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). The American Bar Association's Standards for Criminal Justice provide that the *voir dire* "shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how any exposure has affected that person's attitude toward the trial." *ABA Standards for Criminal Justice* § 8–3.5 (2d ed. 1978). The objective evaluation of this information, however, rests with the trial court. In *Irvin,* the trial court (which itself questioned the jurors challenged for cause) did not engage in a searching and thorough *voir dire.* Instead, the court erroneously credited the jurors' subjective opinions that each could render an impartial verdict notwithstanding his or her opinion. *Irvin v. Dowd, supra,* 366 U.S. at 724, 81 S.Ct. at 1643.

Yount's case, however, differs significantly from *Irvin v. Dowd.* First, counsel themselves conducted the *voir dire* in Yount's trial and, as Judge Hunter concedes, were afforded great leniency in the questioning of veniremen. Second, Yount challenged only three jurors for cause, and two of those jurors, according to the district court's findings, "indicated that they harbored no fixed opinion." *Yount v. Patton, supra,* 537 F.Supp. at 878. Third, the trial court permitted questioning on the exposure of each juror to publicity and the degree of fixation of each juror's opinion. Six of the jurors testified that they had no preconceived opinion of Yount's guilt at all. Among the remaining six jurors, Yount challenged only one—Juror James F. Hrin, whom I discuss below—for cause. The scope and depth of the *voir dire,* and the absence of challenges for cause to each jur-

or except Hrin, was adequate to support an independent and objective determination that, with the exception of Hrin, the jurors could "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643.

Judge Hunter, however, discounts the extensive *voir dire* conducted in Yount's 1970 trial and the absence of challenges for cause to each juror except Hrin. Rather, Judge Hunter's opinion places great weight on the finding that "77 percent of the 163 veniremen questioned admitted that they would carry an opinion into the jury box." Maj. op., at 970. To my mind, this reliance on statistics, without regard to the scope of the *voir dire* or the absence of challenges for cause, elevates to talismanic significance the percentage of veniremen *as a whole* with opinions about a defendant's guilt. I do not believe *Irvin v. Dowd* was ever intended to be read in this fashion. If the scope of the *voir dire* is ample—as it concededly is in this case—the fact that a large percentage of persons who are *not* on the jury have prejudices should carry little weight.

There are undoubtedly many communities in which large percentages of the veniremen have been exposed to pretrial publicity and have a notion of the defendant's guilt. The well-publicized trials of the Watergate defendants, *see United States v. Haldeman, supra,* and of Lieutenant William Calley, *see Calley v. Callaway, supra,* are undoubtedly of this character. But, the very function of the *voir dire* is to root out such persons with preconceived prejudices and identify only those who can, by the trial court's independent determination, lay aside any prejudices and render a verdict based solely on the evidence adduced during trial. Thus, given a *voir dire* which is concededly adequate and which functions to achieve its designed purpose, a venue change is not constitutionally required simply because many of the persons who will *not* serve on the defendant's jury may harbor prejudices as to the defendant's guilt.

For these reasons, I do not join Judge Hunter's holding that a change of venue in

Yount's case was constitutionally required. Nevertheless, I concur in the judgment of the court because I conclude, for the reasons that follow, that Juror James F. Hrin should not have been impaneled in this case.

### III.

In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court held that the mere existence of any preconceived notion as to the guilt or innocence of an accused is not, without more, sufficient to rebut the presumption of a prospective juror's impartiality. *Id.* at 723, 81 S.Ct. at 1643. As the Court observed, however, the adoption of such a rule does not " 'foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' " *Id.,* quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

The test of a prospective juror's impartiality, articulated in *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), and reiterated in *Dowd, supra,* is whether

"the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. . . . The affirmance of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside." [*Reynolds v. United States,* 98 U.S. 145, 156–57, 25 L.Ed. 244 (1878).]

*Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643. *See Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

Hrin's voir dire testimony, taken as a whole, demonstrates the "actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Even the testimony adduced by the prosecution raised serious doubts whether Hrin entered the jury box with an open mind. The record reveals that Hrin asserted simultaneously that he could keep an open mind and that he could not "say for sure" wheth-

er he could do so. In response to the question whether Hrin "could enter the jury box presuming [Yount] to be innocent," Hrin conceded that "[i]t would be rather difficult for me to answer."

Testimony adduced by the defense further revealed that Hrin would require Yount to produce evidence before Hrin would abandon his preconceived opinion of Yount's guilt. Hrin affirmed that he "would not change [his] mind until [he] was presented [with] facts." Having so stated, Hrin abandoned the presumption of innocence. While the law permits a juror to affirm that he or she will enter the jury box with an open mind, a juror cannot require that the defendant produce evidence to wipe clean a prior perception or opinion. The jurors must be impartial when sworn. They cannot agree to be impartial only if the defendant convinces them to be so.

In this case, a juror, by his own admission, required the production of evidence to change his preconceived opinion of the defendant's guilt, and agreed to keep an open mind about this evidence if and when he heard it. As a matter of law, this admission raises a presumption of partiality. A defendant cannot constitutionally be convicted by a jury containing one such juror. *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643; *id.* at 728, 81 S.Ct. at 1645 ("some [jurors went] so far as to say that it would take evidence to overcome their belief").

### IV.

In concluding as a matter of law that Juror Hrin's testimony raises a presumption of impartiality under *Irvin v. Dowd, supra,* I am fully cognizant that in a federal habeas corpus proceeding, the findings of a state court "shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear ...." 28 U.S.C. § 2254(d) (1976); see *Sumner v. Mata,* 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981). Under *Irvin v. Dowd,* however, an opinion of a prospective juror raises a presumption of partiality by operation of law, and therefore poses a mixed question of law and fact. As the Court in *Dowd* stated,

> the test is 'whether the nature and strength of the opinion formed are such as in law necessarily ... raise the presumption of partiality. The question thus presented is one of mixed law and fact.... As was stated in *Brown v. Allen,* 344 U.S. 443, 507 [73 S.Ct. 397, 446, 97 L.Ed. 469], the "so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." It was, therefore, the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors.

*Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643.

In this case the Pennsylvania Supreme Court concluded that "none of the jurors had a fixed opinion as to [Yount's] guilt or innocence." *Commonwealth v. Yount, supra,* 455 Pa. at 314, 314 A.2d at 248. Nevertheless, the trial court found that Hrin had a "solid opinion [although] not quite as solid as it used to be." Neither the trial court nor the Pennsylvania Supreme Court, however, considered the legal effect of Hrin's requirement that the defendant put on evidence to disabuse Hrin of this opinion. This latter requirement raises a presumption of partiality as a matter of law, and therefore does not implicate 28 U.S.C. § 2254(d). *Cf. Smith v. Phillips,* 455 U.S. 209, 218, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (in which no such presumption by operation of law applied); *see* id. at 222 n. *, 102 S.Ct. at 948 n. * (O'Connor, J., concurring).

### V.

The sixth amendment guarantees to each defendant a fair and impartial trial by a jury of his or her peers. The right to trial by impartial jury, old as the Magna Carta, is fundamental to our system of justice. *See Duncan v. Louisiana,* 391 U.S. 145, 151–56, 88 S.Ct. 1444, 1448–1451, 20 L.Ed.2d 491 (1968). Consistency with this constitutional provision requires that each juror lay aside a prior perception or opinion and "render a

verdict based on the evidence presented in court." *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643. Consequently, no juror may enter the jury box with an opinion that can be changed only upon the presentation of evidence by the defense. Juror Hrin admitted to requiring such evidence, and therefore could not constitutionally sit in judgment of Yount. Accordingly, while I dissent from the view expressed in Judge Hunter's opinion that a change of venue was constitutionally required, I concur in the judgment of the court, which directs that the writ of habeas corpus be issued unless Yount is retried within a reasonable time. I do so, however, only for the reason that Juror Hrin was improperly seated.